# United States Court of Appeals
## For the First Circuit

Nos. 06-1400, 06-1401, 06-1402, 06-1403, 06-1404,
    06-1405, 06-1406, 06-1407, 06-1408

UNITED STATES OF AMERICA,

Appellee,

v.

ALCIDES RODRÍGUEZ-DURÁN, et al.

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté,  U.S. District Judge]

Before

Lipez and Newman,* Circuit Judges,
and Selya, Senior Circuit Judge.

Lorenzo J. Palomares for appellant Rodríguez-Durán; Luis M.
Cháves Ghigliotty for appellant Cabello-Acuno; Johnny Rivera
González for appellant Morelis-Escalona; David W. Roman and Brown
& Ubarri on brief for appellant Minoungou; Gary H. Montilla-Brogan
and Aldarondo & Lopez-Bras, P.S.C. on brief for appellant Okley;
Jorge Luis Gerena-Méndez for appellant De La Rosa; Michael R. Hasse
for appellant González-Valero; Luis A. Guzmán Dupont for appellant
Padilla-Moreno; Guillermo A. Macari-Grillo for appellant Almonte.
    Timothy R. Henwood, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and

*Of the Federal Circuit, sitting by designation.

Nelson Pérez-Sosa, Assistant United States Attorney, were on brief, for appellee.

---

November 21, 2007

---

**LIPEZ, Circuit Judge**. The nine appellants in this case were the captain and crew of the *Sea Atlantic*, a cargo vessel that drew the attention of the United States Coast Guard as it rendezvoused with a small boat off the coast of South America in the middle of an August night in 2005. Officers boarded the ship and discovered more than 1,800 kilograms of cocaine, worth millions of dollars, in a hidden storage compartment. The captain and his crew, along with a tenth defendant who was not on board and remains a fugitive, were indicted on drug distribution charges. At the end of their joint trial, which began just forty days after the grand jury returned the indictment, all nine appellants were convicted of possessing the cocaine with intent to distribute it; the captain and first officer also were convicted of conspiracy. They raise a host of alleged errors in their separate appeals, including a claim asserted by five defendants that the district court improperly denied requests for continuances and rushed them to trial. After careful consideration of each contention, we affirm all nine convictions and sentences.

## I.

The facts underlying this case are largely undisputed; to the extent they are contested, we view the evidence in the light most favorable to the jury's verdict. United States v. Downs-Moses, 329 F.3d 253, 257 (1st Cir. 2003).

On the evening of August 25, 2005, a Dutch frigate, the *Van Amstel*, was patrolling off the coast of South America near Curaçao. Among those on board were several members of a tactical law enforcement team from the United States Coast Guard ("USCG") specializing in law enforcement boardings on the high seas.[1] At about 10 p.m., one of the team members, Coast Guard Lieutenant Scott Cieblik, was notified by team members monitoring radar transmissions that two vessels in the area appeared to have altered their courses to come in unusually close proximity to each other. One was a large cargo ship and the other was a small fast-moving boat. A maritime patrol aircraft also noticed the two vessels on radar.[2] At this point, they were off the coast of Colombia, near the Venezuelan border.

Surveillance continued, and shortly before midnight, radar transmissions indicated that the cargo ship – later identified as the *Sea Atlantic* – came into direct contact with the small boat. The small vessel turned off its radar once the two vessels appeared to merge; it was not seen departing the area. The next morning, a helicopter was launched with a Coast Guard law

---

[1] Members of the Coast Guard's law enforcement tactical team are deployed either on U.S. Navy vessels or foreign naval vessels. Their mission is to detect narcotics smuggling and detain those involved. Eight team members were on board the *Van Amstel*.

[2] Cieblik testified on cross-examination, based on a written report he had prepared shortly after the episode at issue here, that the larger vessel was seen in the area by a maritime aircraft at 5:45 p.m.

enforcement member on board; the *Sea Atlantic* was spotted from the helicopter and, at about 7 a.m., the *Van Amstel* approached the cargo ship. The *Sea Atlantic* was not flying a flag identifying its nationality, but Cieblik saw the words "La Paz," the name of Bolivia's capital, written on the stern of the ship, below the vessel's name. Cieblik testified that he observed "several things that stood out to me that [were] not normal for a ship that size." He noticed discoloration of the paint on the side of the vessel, which "possibly indicated that another vessel was alongside and it was trying to cover up its scratch marks." He also noted an unusually large quantity of communications equipment, including antennas and radios, that he considered suggestive of smuggling operations.

Officer Richard Young, a linguist who was part of the enforcement team, then initiated radio contact with the captain of the *Sea Atlantic*, appellant Alcides Rodríguez-Durán. The captain reported that the vessel was registered in Bolivia, its last port of call was Curaçao, its next port of call was Vera Cruz, Mexico, and the purpose of the current voyage was to carry cargo. However, when asked the nature of the cargo, Rodríguez-Durán explained that he was bringing the ship to Mexico to be sold. The inconsistencies in the captain's report raised Cieblik's suspicions, and he told the USCG Command Center in Miami, Florida – Coast Guard District 7 – that he wanted to board the vessel. The Coast Guard secured the

-5-

necessary permission from the Bolivian government,[3] and upon boarding, Cieblik and his team directed most of the *Sea Atlantic* crew members to remain together at the front of the vessel while the officers conducted their inspection.[4]

The investigation turned up a variety of information and items of interest, including a nautical chart of the Caribbean with two markings, one of which was the approximate location where the *Sea Atlantic* and the small boat had appeared to rendezvous. The USCG officers also noticed that two sets of blueprints for the vessel showed different uses for one particular area and, upon a close examination of the ship's layout and measurements, they detected a space below a berthing room – a crew bedroom – that was not readily accessible. A strong odor of fresh paint emanated from the room, which had new carpet and new walls – unlike the other

---

[3] Cieblik explained the standard procedure for obtaining permission as follows: District 7 contacts Coast Guard headquarters in Washington, D.C., which then notifies the White House of the request to board. The White House contacts the Department of State, which makes contact with the country in which the vessel is registered. The scope of the permission granted is then communicated through the same channels back to the officer seeking to board a suspicious vessel. In this instance, the process took about ten hours from the time of Cieblik's request at approximately 9 a.m. on August 26 until he received a response at about 7 p.m. The *Van Amstel* followed the *Sea Atlantic* during that time period.

[4] The captain, Rodríguez-Durán, remained in the pilot house to navigate. The other crew members were appellants Reinaldo José Cabello-Acuno ("Cabello"), Ronald José Morelis-Escalona ("Morelis"), Gandaogo Minoungou, Nii Klaku Okley, Julio César De La Rosa, Ruberts José González-Valero, Alberto Javier Padilla-Moreno ("Padilla") and Carlos Julio Almonte.

berthing rooms on the vessel.  Officer Young testified that he removed a drawer from beneath the bottom bunk, revealing sawdust and fresh paint, "still tacky to the touch," on the floor.  After Cieblik obtained permission from District 7 to perform a "minimally intrusive search," the team removed wooden boards and the carpet from under the bed.  Cieblik testified that, beneath the carpet, "the glue was fresh and still sticky and tacky, like the carpet had just been laid down fairly recently, within the last several hours."  After scraping away paint, they discovered a metal plate with a hatch that was an entry point to the space below.  In that space were dozens of large bales wrapped in burlap sacks; the bales contained brick-sized packages of compressed cocaine.  Sixty-eight bales, containing 1,854 kilograms of cocaine, ultimately were recovered.

An ion scan of the vessel showed traces of cocaine in various locations,[5] including in multiple berthing areas and the ship's galley, and on a forklift inside the cargo hold.  Tests performed on the crew members and their clothing showed cocaine on the hands of two of them, Padilla and Cabello.  Through testimony

---

[5] Petty Officer Isias Ríos testified that an ion scan machine can detect minute traces of chemicals, including narcotics and explosives.  Samples for testing were obtained by using circular pads to swab various surfaces, including clothing and skin.  Ríos placed the samples in a plastic bag to transport them to the ion scan machine at his home base, which in this instance was the *Van Amstel*.  When the machine reported that a sample had "failed," it would identify the substance detected.

at trial from multiple USCG officers, the government suggested that the test results may have understated the actual presence of cocaine. Officer Young testified that, during the surveillance that occurred before the enforcement team boarded the vessel, he observed a crew member with a bottle of liquid that resembled Clorox. Officer Ríos reported that Clorox could prevent the ion scan machine from detecting residue. The scan also may not be accurate if an individual handling narcotics wore gloves or changed his clothes after handling them.

According to Young, when the first bale was brought on deck, in view of the crew members, their previous lighthearted demeanor changed and they became silent and seemingly dejected. The men were detained in the bow area as the USCG officers directed the ship to Puerto Rico, a trip that took more than a week. On September 3, 2005, after the *Sea Atlantic* reached Puerto Rico, a search of the vessel produced three items of evidence introduced at trial. First, a piece of paper found in the cabin occupied by appellant Cabello bore two telephone numbers and the notation "Jose Luis" – the first names of the tenth defendant in this case, Jose Luis Tejeiro-García ("Tejeiro").[6] A second piece of paper was found in a cardboard box used as a trash can in Cabello's berth; it

---

[6] As noted earlier, Tejeiro was not on board the ship when it was detained, and he remains a fugitive. Rodríguez-Durán testified that Tejeiro, who hired all of the crew members, was the owner of the *Sea Atlantic* and three other ships.

contained the words "code on board," and displayed a list that identified the code name for Rodríguez-Durán as "Alpha" and the code name for Cabello as "Charlie." Cabello admitted that he created the list.

On a third piece of paper, found on the nightstand in Rodríguez-Durán's berth, was the word "encuentro," which means "meeting," and some coordinates that appeared to designate a location in the ocean. Rodríguez-Durán admitted that the paper belonged to him.

After their arrival in Puerto Rico, the crew members were interviewed by Immigration and Customs Enforcement ("ICE") agents. Special Agent José Rosado-Santiago ("Santiago") testified at trial that Morelis told him that he had been hired in Venezuela by a man named Tejeiro to work as a longshoreman on the *Sea Atlantic* for $600 per month. Morelis reported that Tejeiro told him the vessel would travel from Venezuela to Curaçao and that a load of illegal merchandise would be delivered by boat. Payment for transporting the contraband would be $40,000. Morelis told the agent that a "go-fast" boat brought the drugs to the *Sea Atlantic* after the vessel left Curaçao.

Rodríguez-Durán was the only defendant to testify at trial. He reported that he had been hired by Tejeiro in early 2004 to master a vessel named *Paola*. However, he did not see the ship until May 2005 when he flew from Venezuela to the Dominican

-9-

Republic, where he met Tejeiro and worked, along with several crew members hired by Tejeiro,[7] on repairing the vessel. He then took the ship to Puerto Cabello, Venezuela, where the vessel was painted, more maintenance was performed, and the ship's name was changed to *Sea Atlantic.* Three crew members left the ship and new ones joined.[8]

In August, Rodríguez-Durán received orders from Tejeiro to take the vessel to Curaçao to pick up cargo; in Curaçao, Rodríguez-Durán again met up with Tejeiro, who told him that the original plan had been to transport drugs from Curaçao in asphalt drums. That plan fell through and Tejeiro instead gave Rodríguez-Durán a set of coordinates on the high seas that designated a meeting point. Tejeiro ordered the captain not to leave the ship and to conceal the real purpose of the trip from his crew; he was instructed to tell the others that the vessel was being transported to Mexico because it had been sold. Rodríguez-Durán testified that Tejeiro threatened to harm his family if he disobeyed the instructions.

The *Sea Atlantic* set off on a course toward Mexico on the night of August 24, and, according to Rodríguez-Durán's testimony, about two hours before they reached the designated meeting point,

---

[7] Among the crew members who joined Rodríguez-Durán at that time were appellants Almonte, De La Rosa, Okley and Minoungou.

[8] Appellants who joined the crew in Venezuela were Morelis, Padilla, González-Valero and Cabello.

he informed the crew about the threat to his life and about the rendezvous that was about to occur with the small boat. He further told them that the small vessel would bring sacks of either drugs or weapons and warned that, if the crew members refused to cooperate, they would be turned over to the individuals delivering the contraband, who would take them to Colombia.

Rodríguez-Durán also testified that, at approximately midnight, the crew members helped transfer sacks of drugs from the small boat into the hiding place on the *Sea Atlantic*. Once the bales of cocaine were sealed in the space beneath the bunk bed, the crew members cleaned the area with Clorox. On cross-examination, Rodríguez-Durán admitted that, while the crew members were gathered on the deck of the ship after the Coast Guard search, they agreed that they would all deny knowing when the drugs came on board. Rodríguez-Durán first reported the alleged threat against his family at his third meeting with the FBI, in early October 2005.

On September 14, 2005, a federal grand jury returned a three-count indictment against appellants and Tejeiro. Count One charged a conspiracy to possess cocaine on board a vessel subject to the jurisdiction of the United States, with the intent to distribute, in violation of 46 U.S.C. app. § 1903(a), (c)(1)(C), (f), (j).[9] Count Two charged the defendants with knowingly aiding

_____

[9] At the time of the indictment, § 1903(a) was part of the Maritime Drug Law Enforcement Act ("MDLEA"), which criminalizes the possession for distribution of controlled substances by persons "on

-11-

and abetting each other, on or about August 26, 2005, in possessing five or more kilograms of cocaine with intent to distribute, in violation of 46 U.S.C. app. § 1903(a), (c)(1)(C), (f), and 18 U.S.C. § 2. Count Three was a derivative forfeiture charge.

A five-day jury trial began on October 24. Relying on Rodríguez-Durán's testimony, appellants defended against the charges in large part by claiming they participated in the drug transfer only because they had no choice. Rodríguez-Durán's closing argument highlighted the threats against his family. The other eight appellants, who did not testify, emphasized in closing arguments that they could not leave the ship when they learned at the last minute about the impending drug transfer and that, if they refused to cooperate, they faced certain death at the hands of the Colombians. Appellants requested, and received, a jury instruction on the defense of duress, and the court also told the jury that the defendants' mere presence on the ship was insufficient to establish guilt.

---

board a vessel subject to the jurisdiction of the United States." The statute was in all material respects recodified in October 2006 at 46 U.S.C. §§ 70501-70507. A vessel subject to United States jurisdiction includes "a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States." 46 U.S.C. app. § 1903(c)(1)(C) [currently 46 U.S.C. § 70502(c)(1)(C), defining such a vessel to include "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States"]. In this case, the Coast Guard obtained the necessary consent from the Bolivian government to board and search the *Sea Atlantic*.

Rodríguez-Durán and Cabello, the first officer, were found guilty of both Counts One and Two. The remaining defendants were acquitted of the conspiracy count, but found guilty of Count Two's possession charge. Forfeiture was ordered against all nine defendants. Rodríguez-Durán was sentenced to a term of 292 months of imprisonment, Cabello was sentenced to a term of 235 months, and the remaining seven appellants were each sentenced to terms of 121 months.

On appeal, defendants collectively raise nine different issues concerning their convictions and sentences, with three recurring most frequently among them: (1) the evidence was insufficient to support their convictions, (2) they were given inadequate time to prepare for trial and pursue plea negotiations, and (3) the district court erred in refusing to grant "safety valve" credit in sentencing. We begin with these three contentions and then turn to the remaining six claims of error.

## II.

Seven defendants claim that the evidence was insufficient to support their convictions, including Cabello, the only one of that group found guilty of both substantive counts.[10] All seven moved for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, after the presentation of the government's

_____

[10] The two who do not make a sufficiency argument are Rodríguez-Durán and Padilla.

case in chief and again at the close of all evidence.  We review the district court's denial of these motions de novo, examining the evidence concerning each defendant in the light most favorable to the government to determine whether a reasonable jury could find guilt beyond a reasonable doubt.  United States v. Bravo, 489 F.3d 1, 9 (1st Cir. 2007).  "The government need not succeed in 'eliminating every possible theory consistent with the defendant's innocence,'" United States v. Pérez-González, 445 F.3d 39, 48 (1st Cir. 2006) (quoting United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003)), and circumstantial evidence alone may be sufficient to provide a basis for conviction,  United States v. Berrios, 132 F.3d 834, 843 (1st Cir. 1998).  See also United States v. Downs-Moses, 329 F.3d 253, 261 (1st Cir. 2003) (noting that the court does not "favor direct evidence over circumstantial evidence, as either type of evidence may satisfactorily support a conviction"); United States v. Hernandez, 218 F.3d 58, 66 (1st Cir. 2000) ("Given the nature of the crime, '[k]nowledge and intent in narcotics cases often must be proved largely by circumstantial evidence.'") (quoting United States v. Valencia, 907 F.2d 671, 678 (7th Cir. 1990)).

Five of the defendants who were convicted only on the possession charge (Minoungou, Okley, De La Rosa, González-Valero and Almonte) are factually in like circumstances and make similar

arguments; we therefore address their sufficiency claims together.[11] We separately discuss Cabello's claim, as well as that of Morelis, whose interview with Agent Santiago was highlighted by the government at trial.

## A. Sufficiency Claim of Minoungou, Okley, De La Rosa, González-Valero, Almonte

To prove that defendants aided and abetted the cocaine venture, the government needed to show that they participated in it and sought by their actions to make it succeed. Downs-Moses, 329 F.3d at 261. "[M]ere association with the principal or presence at the scene of the crime is insufficient, even with knowledge that the crime is to be committed." United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007). A violation of 46 U.S.C. app. § 1903(a) specifically requires proof that (1) the *Sea Atlantic* was "'subject to the jurisdiction of the United States'; (2) the material found on the vessel was a controlled substance; and (3) the defendants knowingly or intentionally possessed the cocaine with the intent to distribute it." United States v. Guerrero, 114 F.3d 332, 339 (1st Cir. 1997).

These five appellants challenge only the sufficiency of the evidence on the third element, asserting that the government offered no proof of their willing involvement in the cocaine

---

[11] Although their arguments are not identical – for example, not all of them explicitly invoke the duress defense on appeal – we choose for convenience to treat them as a group.

-15-

transport.  They cite Rodríguez-Durán's testimony that none of the crew members had knowledge of the purpose of the voyage until shortly before the rendezvous with the small boat, when it was impossible for them to refuse to participate.  They point out that they were hundreds of miles offshore and threatened with being turned over to the Colombians who were delivering the cocaine – with a likely fatal outcome.[12]  Several appellants emphasize that the ion scan showed no traces of cocaine on their persons and that the drugs were not found in their bedrooms.

The primary difficulty with appellants' argument is a familiar one: the jury may reject even a "reasonable hypothesis inconsistent with guilt," United States v. Guerrero-Guerrero, 776 F.2d 1071, 1075 (1st Cir. 1985), so long as the evidence also reasonably supports culpability, see, e.g., United States v. Ortiz, 447 F.3d 28, 33 (1st Cir. 2006) ("[T]he possibility of innocuous explanations for [a defendant's] behavior does not foreclose the jury's contrary inferences."); Guerrero-Guerrero, 776 F.2d at 1075 ("[T]he jury is free to choose among varying interpretations of the evidence, as long as the interpretation they choose is

---

[12] The government's drug trafficking expert, Eddie Vidal, a member of the Drug Enforcement Administration's task force in Ponce, Puerto Rico, testified on cross-examination that narcotics dealers in Colombia were among the most violent in dealing with drug couriers who failed to make deliveries: "In the states, they kill them in the street or they kill them in their own homes . . . .  In Colombia, they chop them up in pieces or they cut his head off."

reasonable."). Here, the jurors were properly instructed that, to reach a guilty verdict, they needed to find that the defendants willingly participated in the venture; the jurors were specifically told that mere presence, and even knowledge of the crime, was insufficient and that the defendants must have "knowingly and willfully tak[en] steps to help some other person to commit a crime." They also were instructed at length on the defense of duress.[13]

Despite these explicit instructions, the jury concluded that the defendants were guilty of aiding and abetting the possession of the cocaine. Ample evidence supported that determination. Unquestionably, the jury could have found that all crew members were involved in transferring the cocaine between the two vessels; Rodríguez-Durán said as much, and the number of bales and the nature of the concealment strongly indicated that many hands were necessary to accomplish the transfer and then seal the drugs in the hidden compartment during the early morning hours of

_____

[13] Toward the end of its duress instruction, the district court summarized as follows:

> To prove a defendant guilty when a duress defense is raised you must conclude beyond a reasonable doubt that the defendants participated in the commission of the offense, that no such threat occurred or that the threat was not immediate or that the defendants had a reasonable opportunity to escape or otherwise frustrate the threat, but did not exercise this opportunity or that the defendants did not have a well-grounded belief that the threat would be carried out.

August 26.  According to Officer Young's testimony, it took six or seven officers some ninety minutes simply to remove the 68 bales from the storage area; the jury reasonably could conclude that the effort to move them, store them, construct the bed, paint and lay carpet would have engaged all of the crew.

In addition, the affirmative evidence suggesting Cabello's more active involvement and, possibly, prior knowledge – the "code on board" list and the paper with phone numbers and Tejeiro's name that were found in his berth – reasonably could be viewed as discrediting Rodríguez-Durán's testimony that none of the crew was aware in advance of the purpose of the trip, thus undermining the duress defense for all of the defendants.[14] Rodríguez-Durán's testimony was further discredited by the captain's admission that he had lied to law enforcement officers on multiple occasions.[15]  That fact not only entitled the jury to reject his testimony, but also to presume that "the fabrication was

_____

[14] Agent Cabrera testified that code language often is created for narcotics operations.

[15] For example, when he was first interviewed by federal agents, he told them that he did not know when the drugs were loaded onto the *Sea Atlantic*, but speculated that they were brought on board in Puerto Cabello.  At trial, he testified that the cocaine was transferred from the go-fast boat at about midnight on August 25.  In addition, in an affidavit dated October 22, 2005, Rodríguez-Durán stated that he did not see any firearms in the possession of the men in the small boat; in his direct examination at trial, he stated that the men were armed.  He also admitted that, after the drugs were found, he and all of the crew members agreed to lie to the Coast Guard agents about what they knew about the drugs.

all the more proof of [defendants'] guilt," United States v. Jiménez-Pérez, 869 F.2d 9, 11 (1st Cir. 1989); see also United States v. Marks, 365 F.3d 101, 107 (1st Cir. 2004). Since defendants chose to present their duress defense through the testimony of Rodríguez-Durán, his impeachment by the government was necessarily damaging to them.

In addition, Officer Young's testimony that the crew members became silent and dejected when they realized the cocaine had been discovered reinforces the inference of culpable participation. The jury also heard testimony from Officer Vidal of the Drug Enforcement Administration task force that persons who transport shipments of drugs "do it with full knowledge and for purely economic reasons" and that drug traffickers would not entrust a multi-million-dollar shipment to anyone in whom they did not have confidence.

To be sure, this was a case in which the government's evidence of complicity by these five defendants was wholly circumstantial and the jury reasonably could have concluded that they were initially unwitting, and later unwilling, participants in the venture.[16] On this record, however, "the jury could certainly

---

[16] Appellant González-Valero, the crew's cook, offers the most developed claim of non-involvement. At oral argument, counsel emphasized that his client's behavior after the discovery of the drugs was consistent with his reserved demeanor, which Officer Young acknowledged he displayed. González-Valero also notes that he was not hired for a cargo-related role that would link his duties to the illicit cargo, and the only evidence that he was

have chosen to believe that the converging circumstances pointed toward a more sinister truth and been persuaded thereby of appellants' guilt." Jiménez-Pérez, 869 F.2d at 11. We therefore hold that the evidence was sufficient to support defendants' convictions for aiding and abetting each other in the knowing possession of the cocaine found on the *Sea Atlantic*, with the intent to distribute it.[17]

---

involved at all is the captain's non-specific testimony that "the crew" helped with the unloading. However, Rodríguez-Durán confirmed on cross-examination that "every crew member" helped to unload the cocaine. Moreover, like the other defendants, González-Valero relied on the duress argument at trial, where counsel emphasized to the jury that his client "found himself in a situation where he did what was reasonably necessary to avoid a greater harm" and "was justified under our law to do what he did under the circumstances on the high seas." The jury was free to accept his implicit concession that he was involved with the drugs and to reject the testimony that his participation was involuntary. His reliance on Direct Sales Co. v. United States, 319 U.S. 703 (1943), therefore does not assist him. The Court there observed that "the step from knowledge to intent and agreement" – establishing a conspiracy for an illicit purpose – requires that a defendant possess "more than suspicion, more than knowledge, acquiescence, carelessness, indifference, [or] lack of concern." Id. at 713. In reaching a guilty verdict on the possession count, the jury necessarily found that González-Valero did have the requisite intent, and, as we have explained, the evidence – albeit circumstantial – was sufficient to support that conclusion.

[17] We note that, contrary to the argument of some defendants, their acquittal on the conspiracy count is not inconsistent with a finding of willing participation  in aiding and abetting possession of the cocaine. The jury reasonably could conclude that they sought to facilitate the venture but did not agree to a drug distribution scheme. See United States v. González-Vélez, 466 F.3d 27, 37 (1st Cir. 2006) (holding that to prove conspiracy, the government must establish, inter alia, "'that an agreement existed to commit the underlying offense'" (quoting United States v. Gómez, 255 F.3d 31, 35 (1st Cir. 2001))).

**B. Sufficiency Claim of Morelis**

Given the previous sufficiency analysis, Morelis's sufficiency claim need not detain us. In addition to the evidence recited above, the jury heard Agent Santiago's testimony that Morelis had admitted being informed by Tejeiro about the illicit purpose of the *Sea Atlantic*'s voyage and also had been told that $40,000 would be paid for the undertaking. The secret compartment was under the bed in his berth,[18] and Rodríguez-Durán testified that Tejeiro told him to put the sacks of drugs there. As noted above, the government's narcotics expert, Vidal, testified that a drug shipment of such a high value would not be entrusted to someone in whom the ringleader had no confidence. The jury thus could have drawn the inference that Morelis's proximity to the drugs reflected Tejeiro's trust in him. In light of Morelis's acceptance of the job and the inferences that plausibly could be drawn concerning both the crew as a whole and Morelis individually, the jury reasonably could conclude that the evidence supported the "'requisite two-step inference': (1) that the vessel was engaged in obviously illegal activity, and (2) . . . Appellant was ready to assist in the criminal enterprise." Bravo, 489 F.3d at 9 (quoting Jiménez-Pérez, 869 F.2d at 11).

---

[18] Morelis shared the berth with De La Rosa. The concealed space was directly beneath Morelis's bed.

-21-

Morelis also contends that his conviction is flawed based on the government's failure to prove that the *Sea Atlantic* was subject to United States jurisdiction. Specifically, he emphasizes a lack of evidence that the cocaine was directed toward, or otherwise would affect, the United States. We previously have held that the MDLEA does not contain such a nexus requirement; the flag nation's consent to jurisdiction is sufficient. See Bravo, 489 F.3d at 7 (citing cases); see also United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999) ("[D]ue process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA when the flag nation has consented to the application of United States law to the defendants."). The evidence was therefore sufficient to establish Morelis's aiding and abetting liability.

## C. Sufficiency Claim of Cabello

Cabello was found guilty of both substantive counts. To prove his guilt on the conspiracy charge, the government needed to show "'that an agreement existed to commit the underlying offense . . . , that the defendant knew of the agreement, and that he opted to join in it, intending to commit the substantive offense,'" United States v. González-Vélez, 466 F.3d 27, 37 (1st Cir. 2006) (quoting United States v. Gómez, 255 F.3d 31, 35 (1st Cir. 2001)). The jury could have concluded that he conspired with Rodríguez-Durán and Tejeiro based, among other things, on the piece of paper

-22-

found in his berth on which were written the two phone numbers for "Jose Luis." The suggestion of ongoing communication with the crime's mastermind reinforces the significance of Cabello's status as the first officer on the ship, a position in the crew's hierarchy that a jury reasonably could consider suggestive of collaboration with the captain (and Tejeiro). In addition, as noted above, authorities found the paper in his trash can with the list of code names and the designation "code on board." Cabello admitted that he created the list and that it belonged to him, and both he and Rodríguez-Durán had code names on that list. Together with the evidence recited above in connection with the other defendants' sufficiency claims, the documentary and role-in-the-crew evidence amply supported the jury's conclusion that Cabello was not only a willing participant but also part of a trio who planned and managed the venture.

### III.

Five defendants assert that the district court abused its discretion in denying motions for continuance that were made both by the government and by nearly all of the defendants, allegedly rushing the defendants to trial at great cost to their ability to defend the charges against them and pursue plea negotiations.[19] In addition, two of the five defendants claim that they were denied

---

[19] This issue was raised on appeal by Morelis, Rodríguez-Durán, Padilla, De La Rosa and Almonte.

-23-

the minimum thirty days of pretrial preparation time guaranteed by the Speedy Trial Act.  See 18 U.S.C. § 3161(c)(2).[20]  We first assess the district court's discretionary ruling and then consider the alleged statutory violation.[21]

## A. Denial of the Continuance Motion

The decision whether to grant a continuance is a matter of discretion for the trial judge, and assessing whether denial of a request to postpone the start of trial constitutes an abuse of discretion requires a careful review of the facts of the particular case. Ungar v. Sarafite, 376 U.S. 575, 589 (1964); see also United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995) ("[E]ach case is sui generis."); United States v. Torres, 793 F.2d 436, 440 (1st Cir. 1986) ("In deciding whether denial of a continuance constitutes an abuse of discretion, we cannot apply a mechanical test, but must evaluate each case on its own facts.").  The relevant factors include the reasons contemporaneously presented in support of the request, the amount of time needed for effective preparation, the complexity of the case, the extent of

---

[20] Section 3161(c)(2) provides: "Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se."

[21] Defendant Almonte also asserts that denial of the continuance violated his Sixth Amendment right to put on a defense. However, he fails to cite cases or otherwise develop that claim, and we therefore deem it waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

inconvenience to others if a continuance is granted, and the likelihood of injustice or unfair prejudice attributable to the denial of a continuance. Saccoccia, 58 F.3d at 770. We will find an abuse of discretion only if defendants show that "the court exhibited an 'unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" United States v. Rodriguez-Marrero, 390 F.3d 1, 21-22 (1st Cir. 2004) (quoting United States v. Rodriguez Cortes, 949 F.2d 532, 545 (1st Cir. 1991)). Identifying prejudice from the ruling is essential. See, e.g., Saccoccia, 58 F.3d at 770 ("[T]he decision below must endure unless the party who moved for the continuance can demonstrate that, in withholding relief, the trial court indulged a serious error of law or suffered a meaningful lapse of judgment, resulting in substantial prejudice to the movant.").

In this case, the district court held a status conference on September 30, 2005 – two weeks after defendants' arraignment – and told counsel at its conclusion that the trial would begin on October 24 and that that was a "[f]irm date." On October 13, the government filed a motion requesting a three-week continuance, noting that it was still in the process of finalizing discovery and, to date, had provided approximately 1,000 pages of discovery to defense counsel. The government also reported that plea negotiations had begun and expressed its belief that "a brief extension of time is needed in order for the attorneys to timely

review the discovery and discuss it with their respective clients."

The court denied the motion the next day without comment and subsequently denied five additional continuance requests made by various defendants between October 19 and October 23, also without explanation.

Meanwhile, activity in the case was proceeding along two fronts: the government continued to release discovery material, and it exchanged plea offers with defendants. On October 17, the government told defense counsel by letter that it would consider plea offers, and it recommended that a proposed package deal be submitted by the close of business the next day. The letter also identified three witnesses the government intended to call at trial[22] and stated that it would provide all of the defendants' post-arrest statements to all parties on October 18. The record indicates that three additional discovery packages were provided: on October 17, defendants received four pages of documents and a CD that contained nautical charts and deck plans for the *Sea Atlantic*; on October 18, they received about 30 pages of materials consisting

_____

[22] These witnesses were Officer Ríos, who performed the ion scans; an unidentified chemist from the Drug Enforcement Administration; and DEA Task Force Agent Vidal, who had "specialized knowledge regarding the means and methods undertaken by drug traffickers." The government explained that Vidal's testimony involved "the *modus operandi* of drug traffickers which is appropriate and relevant and should assist the jury in understanding other evidence in this case." On October 21, the government identified the DEA chemist who would testify as Walter Rodriguez.

of "Reports of Investigation" concerning each defendant and waiver of rights forms dated September 3, as well as a CD containing navigation charts; and on October 22, the government released 150 pages consisting of "Statement of Rights" and "Interview Notes" for each defendant, as well as ion scan results, a Coast Guard prisoner log, a photograph of narcotics, and "miscellaneous" documents from USCG Officers Cieblik and Young.

On October 19, before the defendants were able to respond to the government's October 17 invitation for plea offers, the government sent counsel a letter offering to recommend a deal in which the defendants would plead guilty to both substantive counts of the indictment in exchange for sentences between 135 and 168 months' imprisonment; the government said it would not oppose a sentence at the lower end of that range and also invited "reasonable counter-offers." On October 22 – the Saturday before the Monday start date for the trial – defendants responded with an offer to accept seventy months' incarceration in lieu of trial. The government rejected the offer, noting that "[t]his could have been a possible recommended sentence if a formal counter-offer had been received in a timely fashion." However, because trial was about to begin, a jury panel had been summoned, witnesses had flown in from San Diego, and "the government has spent valuable time and resources in preparing for trial," the government rejected the offer.

One final plea attempt was made on the second day of trial, when the defendants submitted a joint offer in writing for ninety-six months' imprisonment, with an enhancement to be imposed on the captain for special skills and knowledge. Additionally on that day, trial proceedings began with Rodríguez-Durán's counsel reporting to the judge that defendants wished to enter a straight plea to a single count of the indictment, while preserving the option to argue their duress defense at sentencing. The court engaged in an extended colloquy with counsel and ultimately concluded that the case was not ripe for a plea, in part because more than one attorney expressed concern about losing the opportunity to introduce evidence of the duress defense. In addition, the court indicated concern that some of the defendants were being pressured to go along with a plea, "[a]nd counsel may not even be aware of what the pressures are." The court noted that, "[i]t seems to me that a lot more talking has to take place among defendants before I take this plea," but insisted that any further discussion take place during the lunch recess because "[t]here is no way I am going to continue wasting time with this."

In arguing that the court abused its discretion in refusing to delay the trial's start date, defendants point in particular to their need for more time to complete plea negotiations – reflected in both the government's refusal to consider their offer on October 22 and the court's observation that

-28-

more discussion was needed on the October 25 plea offer – and also emphasize their inability to fully analyze the voluminous discovery material so that they could prepare effectively for trial. Although the government originally sought a continuance for those same purposes, it argues on appeal that the court's refusal to delay the trial was not an abuse of discretion. It maintains that the record does not show that defendants had inadequate time to mount a meaningful defense – citing in support the acquittals of most of them on the conspiracy charge – and it further argues that the facts surrounding the plea negotiations demonstrate that more time would not have been productive.

We recognize that the arrest-to-trial period here was extraordinarily short, particularly for a case in which nine separate defense counsel needed to coordinate schedules in order to collaborate on trial strategy. We also appreciate that counsel may have felt discomfort at proceeding without greater intimacy with the many pages of discovery materials. "'The focus, [however], is on what constitutes a reasonable period of time for preparation, not on defense counsel's subjective satisfaction with his level of preparedness.'" United States v. Moore, 362 F.3d 129, 135 n.7 (1st Cir. 2004) (quoting United States v. Marrero-Ortiz, 160 F.3d 768, 777 (1st Cir. 1998)). Even if we were to conclude that the court erred in pushing the case to trial so quickly, "[a] defendant is generally not entitled to a new trial unless he or she can identify

specific ways in which the court's erroneous denial of a continuance prejudiced his or her defense." Rodriguez-Marrero, 390 F.3d at 22. Here, in neither the continuance motions themselves, nor in their appellate briefs – the latter prepared after trial, with the advantage of time and perspective – have defendants developed their prejudice claims sufficiently to demonstrate actual harm from the short pre-trial period.

The Supreme Court has said that, in assessing the circumstances surrounding a continuance request, we should give particular attention to "the reasons presented to the trial judge at the time the request is denied." Ungar, 376 U.S. at 589; see also Torres, 793 F.2d at 440. In addition, because lack of time to identify supportable defenses or crucial evidence frequently will be the harm alleged from denial of a continuance in a criminal case, evidence of prejudice developed during or after trial that is consistent with the original request for delay also may play a pivotal role in our review. Indeed, it may only be on appeal, after counsel has had time to carefully review the record, that the magnitude of the prejudice can be specifically shown. For example, when a defendant seeks a continuance because of voluminous discovery material, his later claim of prejudice from a denial will be enhanced if he identifies particular significant, exculpatory evidence that would have been available to him if the continuance had been granted. Cf. Rodriguez-Marrero, 390 F.3d at 22 ("Although

[defendant] states that the government produced twenty thousand pages of documents and tape recordings relating to thirty-five individuals, he fails to identify (with the one exception already noted) any material document that he was unable to review due to the time pressures.").

Here, defendants' motions largely asserted generalities – the complexity of the case and the thousands of pages to review, the challenge of preparing a defense for foreign defendants unfamiliar with the United States' justice system,[23] the desire to continue plea negotiations and the need to find maritime experts. Even with the benefit of hindsight, they have pointed to no pivotal evidence or theories that realistically could have made a difference had they been allotted more time to prepare for trial. We now briefly address each point that has been raised on appeal, explaining why we conclude that none merits vacating the judgments.

1.  Inability to Complete Plea Negotiations

Defendants cite the government's rejection of their October 22 plea offer based on the imminent start of trial as evidence that a postponement in the trial date would have enabled them to successfully complete plea negotiations. Even assuming, for argument's sake, that denying or curtailing the time to conduct plea negotiations can be a basis for a claim of abuse of discretion

---

[23] The crew consisted of three Venezuelans, three Dominicans, two Africans and one Mexican.

– a matter on which we do not opine – no such abuse occurred here. The defendants' and the government's expectations for a deal remained far apart,[24] and, as reflected in the colloquy described above, at least some defendants remained ambivalent about entering a plea. Consequently, the possibility that a plea bargain acceptable to all could have been reached within a reasonable period of time is too speculative to factor significantly into our assessment. Defendants had no "right" to negotiate a plea, see Weatherford v. Bursey, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."), and even if some of the group had been able to reach agreement with the government, the court had the prerogative – which it indicated it might exercise – to reject a deal that did not embrace all defendants. Cf. United States v. Ventura-Cruel, 356 F.3d 55, 59 (1st Cir. 2003) ("It is well settled that a defendant does not have an absolute right to plead guilty.") (citing Santobello v. New York, 404 U.S. 257, 262 (1971)).

It is apparent that the negotiations were not on the brink of completion, and defendants' general claim that an unspecified amount of additional time would have made a difference

---

[24] During Minoungou's sentencing hearing, the prosecutor confirmed that the government would not agree to a deal under which the defendants could argue duress at sentencing. Defense counsel also indicated at that hearing that the government was unwilling to accept a plea on only the aiding and abetting count.

falls far short of showing the "substantial prejudice" necessary to justify a new trial.[25]

2. Certification of Consent

Defendants Morelis, De La Rosa and Rodríguez-Durán complain that they needed more time to obtain direct evidence from Bolivia to challenge the validity of the Coast Guard's consent to board the *Sea Atlantic*. However, defendants received copies of the official certification document on September 29. They concede that the certification is all that is required under the MDLEA to prove consent, see 46 U.S.C. app. § 1903(c)(1), and they fail to explain how more time would have enabled them to challenge the document or the consent it reflects.

In his brief and at oral argument, Rodríguez-Durán also contended that the certification contained an incorrect location for the vessel and that more time was needed to retain a maritime expert to explore the implications of that mistake. Specifically,

---

[25] Defendant Almonte made a specific request on October 20 for a one-week continuance to complete plea negotiations and to enable him to further investigate the duress defense, including through the hiring of a polygraph expert. His motion states that counsel had contacted an expert who could produce a written report by October 27. In his brief and at oral argument, counsel explained that such evidence was important to convince the government of Almonte's truthfulness. The apparent intent, therefore, was to assist plea negotiations. Defendant does not state that a polygraph test was, in fact, performed and does not explain either how he would have used the test results at trial or what advantage could have been derived from them. His expressed desire to obtain an expert report is thus not a factor of consequence to our analysis.

-33-

his counsel asserted at argument that he believed the vessel was located in Panamanian waters and that the Coast Guard thus lacked jurisdiction to board. Officer Cieblik admitted at trial that the location description on the certification erroneously indicated the vessel was boarded northeast of Aruba, rather than northwest, and attributed the discrepancy to a mistaken notation. To the extent that error reflected an actual jurisdictional problem – and we have no basis for thinking it does – we fail to see why defendants could not have addressed the point in the three weeks between receiving the certification and the start of trial. Certainly in the year between trial and the filing of appellate briefs, any real jurisdictional flaw could have been substantiated.

Consequently, we conclude that the alleged lack of time to pursue this issue lends no support to defendants' claim that the court erroneously denied a continuance.

3. Voluntariness of Morelis's Statement

Before Agent Santiago testified about Morelis's statement admitting that Tejeiro told him that the *Sea Atlantic* would carry contraband, the court observed that no voluntariness issue had been raised with respect to the statement. Morelis's counsel responded that he had not yet done so, but had filed a continuance motion because he had not had time "to explore the whole contents of all the documents." De La Rosa points to this exchange in arguing that the court's denial of a continuance was an abuse of discretion.

Neither De La Rosa nor Morelis develops this point, however, by showing that Morelis's counsel could have raised a viable voluntariness challenge to the statement if he had had more time to scrutinize the documents and interview his client. Given counsel's opportunity to examine the relevant documents since the time of trial, we can only conclude that the documents, in fact, do not support a voluntariness challenge and that the district court's continuance ruling is not vulnerable on that basis.

4. Rodríguez-Durán's Duress Claim

At oral argument on appeal, counsel for Rodríguez-Durán asserted for the first time that a continuance was necessary so that he could travel to Venezuela to investigate an alleged abduction of his client's daughter. Counsel implied that such an investigation would substantiate Rodríguez-Durán's claim that Tejeiro had threatened to retaliate against his family if he refused to cooperate in the drug trafficking scheme. At trial, Rodríguez-Durán testified that Tejeiro had told him that, in particular, his daughter and mother-in-law were being watched, and stated that Tejeiro had made contact with his family in Puerto Cabello. He further testified that he felt that "serious injury or death may be placed upon her."[26] However, Rodríguez-Durán never

---

[26] The court sustained the government's hearsay objections when defense counsel asked Rodríguez-Durán if he knew whether Tejeiro had visited his family and had either offered or delivered money to them.

sought a continuance based on the need to travel to Venezuela and did not raise, let alone explain, the need to do so in his brief on appeal. Even were the issue not waived, see United States v. Jiminez, 498 F.3d 82, 88 (1st Cir. 2007) (noting "the well-settled appellate rule that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived'" (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)), we would have no factual basis for assessing its relevance to the district court's continuance ruling.

5. General Claims of Prejudice

Finally, we find no merit in the miscellaneous generalities invoked by defendants, including their characterization of this case as complex and their invocation of the foreign citizenship of the defendants. Although the government provided a substantial quantity of discovery, the factual circumstances were not particularly complicated; the indictment stemmed from a single episode with a fixed cast of participants. Cf. Rodriguez-Marrero, 390 F.3d at 5, 9, 22 (considering continuance claim in case involving an alleged four-year drug conspiracy, four-week trial, more than forty witnesses, at least 4,500 pages of discovery, and twelve defendants charged in a twelve-count second superseding indictment). The defendants' foreign nationalities are likewise without significance absent some identifiable, particular prejudice from their status, such as a

-36-

language barrier that prevented their meaningful participation in the proceedings.

In sum, "[w]hile the trial judge held defendants to a tough schedule, in the absence of a showing of unfair prejudice to defendants, there was no manifest abuse of discretion." United States v. Orlando-Figueroa, 229 F.3d 33, 41 (1st Cir. 2000).

## B. Speedy Trial Act

Rodríguez-Durán and Morelis also claim that the district court's trial schedule violated the Speedy Trial Act, which guarantees that, unless a defendant consents in writing, a trial may not start sooner than thirty days from the date a defendant first appeared through counsel or expressly elected to proceed pro se. See 18 U.S.C. § 3161(c)(2). Although the sanction for a Speedy Trial Act violation is dismissal of the indictment, id. § 3162(a)(2), the right to dismissal is waived if a defendant fails to move for dismissal prior to trial, id., and even plain error review is unavailable, United States v. Spagnuolo, 469 F.3d 39, 46 (1st Cir. 2006). No such motion was filed in this case; defendants' Speedy Trial Act claim is therefore without merit. See United States v. Paradis, 802 F.2d 553, 556 (1st Cir. 1986) (finding waiver where defendant failed to move prior to trial for dismissal based on violation of the "30-day minimum to trial

provision").  Given defendants' waiver, we need not evaluate their calculation of countable days.[27]

## IV.

Defendants Rodríguez-Durán and Cabello assert that the admission into evidence of Morelis's statement recounting Tejeiro's offer of a $40,000 payment for the transport of contraband violated their rights under the Confrontation Clause of the Sixth Amendment. We exercise de novo review over Confrontation Clause challenges raising questions of law.  United States v. Earle, 488 F.3d 537, 542 (1st Cir. 2007).

The Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The primary purpose of confrontation is "to secure for the opponent the opportunity of cross-examination," Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (quotation marks and emphasis omitted), and, in Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the Clause "bars admission of testimonial hearsay in a criminal case unless the declarant is unavailable and the accused has had a prior opportunity for cross-examination," Earle, 488 F.3d at 542.

When the out-of-court statement at issue was made by the defendant, it is typically classified as an admission and not

---

[27] We note, however, that a quick review indicates that no Speedy Trial Act violation occurred.

-38-

hearsay, and ordinarily may be admitted against him. See Fed. R. Evid. 801(d)(2); United States v. Vega Molina, 407 F.3d 511, 519 (1st Cir. 2005). In the context of a multi-defendant trial, however, the admission of a non-testifying defendant's inculpatory extrajudicial statement is carefully limited. Even when such a statement may be introduced against the declarant as an admission, it may not be admitted as to the other defendants unless there is an independent ground for doing so. Vega-Molina, 407 F.3d at 522 (citing Crawford, 541 U.S. at 42-50). Where no alternative basis for admission exists, the trial court should instruct the jury that the out-of-court statement may be considered as evidence only against the declarant and not against his co-defendants. Id.; see also Richardson v. Marsh, 481 U.S. 200, 211 (1987) (finding no Confrontation Clause violation where co-defendant's confession was admitted "with a proper limiting instruction").

But a limiting instruction will not always be adequate to protect the Sixth Amendment rights of the declarant's co-defendants. In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court concluded that in certain instances – where a non-testifying defendant's extrajudicial statement is "powerfully incriminating" against other defendants – the statement may not be used in a joint trial at all. Id. at 126, 135-36; Vega Molina, 407 F.3d at 518-19; see also Gray v. Maryland, 523 U.S. 185, 192 (1998). In such a case, "the risk that the jury will not, or

cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton, 391 U.S. at 135.

Defendants argue that Morelis's statement was "powerfully incriminating" within the meaning of Bruton and that its admission into evidence through Agent Santiago's testimony was thus reversible error. The testimony was given during questioning by the prosecutor about Santiago's interview with Morelis after the *Sea Atlantic* arrived in Puerto Rico. Asked if Morelis indicated whether Tejeiro had told him the purpose of the trip at the time he was hired in Venezuela, Santiago answered affirmatively. He then elaborated:

> He stated that they were going from Venezuela to Curaçao to pick up a load. But Tejeiro told to him that a load with illegal merchandise will arrive to the boat, and he will pay $40,000 for that.

According to Rodríguez-Durán and Cabello, the statement was unduly prejudicial because it conflicted with the captain's testimony that the crew members had no knowledge of the drug deal before they boarded, undermining the duress defense and allowing the jury to infer intent to participate that was otherwise unsupported by the evidence.

Bruton, however, applies only to a statement that is "inculpatory on its face," Vega Molina, 407 F.3d at 520 (citing

-40-

Richardson, 481 U.S. at 207). "Statements that are incriminating only when linked to other evidence in the case do not trigger application of Bruton's preclusionary rule." Id.; see also Richardson, 481 U.S. at 209 (rejecting extension of Bruton to "confessions incriminating by connection").

The statement at issue here made no explicit reference to any defendant other than Morelis and Tejeiro, and Rodríguez-Durán and Cabello point only to prejudicial inferences the jury could have drawn from the statement in light of other evidence presented at trial. As our discussion makes clear, this is not a Bruton problem, and the district court therefore did not err by admitting Santiago's testimony about Morelis's statement.

However, our conclusion that Bruton is inapt does not necessarily mean that there was no Sixth Amendment violation as recognized by Crawford.[28] As we have explained, Morelis's statement was admissible only as to him, and the court should have instructed the jury not to consider it in assessing the other defendants' involvement in the charged criminal activity.

---

[28] A Confrontation Clause challenge under Crawford requires two threshold determinations: whether the out-of-court statement was hearsay and whether it was testimonial. Earle, 488 F.3d at 542. No one contests that Morelis's statement in his post-arrest, custodial interview was testimonial hearsay as to Rodríguez-Durán and Cabello. See Davis v. Washington, 126 S. Ct. 2266, 2273 (2006) (noting that "'[s]tatements taken by police officers in the course of interrogations'" would qualify under any definition of "testimonial" statements) (quoting Crawford, 541 U.S. at 52-53 (alteration in original)).

-41-

> That <u>Bruton</u> and its progeny do not absolutely
> preclude the introduction of a confession
> against the declarant-defendant at a joint
> trial . . . does [not] suggest condonation of
> the use of the declarant's out-of-court
> confession against the other defendants.
> Indeed, the case law unambiguously requires
> the trial court to instruct the jury that an
> out-of-court confession may not be considered
> as evidence against the declarant's
> codefendants.

<u>Vega Molina</u>, 407 F.3d at 522. The government does not urge any alternative basis for admitting Agent Santiago's testimony against Rodríguez-Durán and Cabello. Rather, it asserted in its brief and at oral argument that Santiago's testimony was admitted only as to Morelis. The record, however, is to the contrary. We have found no indication that the court gave such a limiting instruction either when the evidence was admitted or when the government relied on it in closing. In advance of Santiago's testimony, the court explicitly sought to avoid a <u>Bruton</u>-<u>Crawford</u> problem by limiting the evidence that could be introduced about Morelis's statement,[29] but it did not advise the jury to consider the evidence only against Morelis.

---

[29] After noting that "[e]verybody has been warned there can be no *Bruton* issue in this questioning," the court stated that it would not allow the full contents of Morelis's statement to be introduced. It then said:
> There are going to be some questions posed to the agent, period. And the areas of inquiry will not touch upon *Bruton*. There is going to be nothing against the law in this questioning. I assure you that.

The government emphasized the statement during the rebuttal portion of its closing argument, asserting that the case was not about duress, but about "a business enterprise" in which "nine able-bodied seamen [] were hired to transport illegal cargo by Jose Luis Tejeiro." The prosecutor then said:

> Think about the postarrest statement of Ronald Jose Morelis that was made on September 3rd, 2005. This is very important. This is before any alleged duress. State the name who hired you. What does he say. Jose Luis Tejeiro hired him.

An objection from Morelis's attorney that "[t]hat is not what he testified" was overruled, and the prosecutor continued:

> What was that postarrest statement. He said that Jose Luis Tejeiro hired him to bring illegal merchandise for $40,000 while he was in Curaçao. And that the drugs or the merchandise were going to be delivered while he was at sea. That is not duress.

Again, no limiting instruction was given, and the failure to do so was error. See Vega Molina, 407 F.3d at 521 ("Such an instruction would have been proper and should have been given.").[30] Rodríguez-

_____

[30] In both its brief and at oral argument, the government noted that the court instructed the jury to give individual consideration to each defendant. That is not the same as instructing the jurors that they may not consider Morelis's statement against the other defendants. Indeed, even in its brief on appeal, the government continues to treat the statement as evidence against all defendants. In responding to the defendants' sufficiency argument, the government noted that Tejeiro had hired the whole crew and had offered Morelis $40,000. The brief then states: "If one crew member was approached and agreed to participate (which can be inferred since he boarded the vessel after he was offered money to transfer contraband), the other co-defendants, who were also all hired by Tejeiro, were likely approached as well and boarded the

-43-

Durán and Cabello neither requested such an instruction at trial nor objected to its omission, however, and they are thus entitled to relief only if they can establish plain error.[31]  See id.

These two appellants are unable to satisfy that standard. Accepting that an error occurred and that it was obvious, they additionally must show impact on their substantial rights.  United States v. Andújar-Basco, 488 F.3d 549, 554 (1st Cir. 2007).  If all three of these prerequisites are satisfied, there is yet a further prerequisite; we may reverse only to prevent a miscarriage of justice.  Id.; see also United States v. Robinson, 473 F.3d 387, 396-97 (1st Cir. 2007) (explaining that error under the plain error standard will not be noticed "unless it caused a miscarriage of justice or seriously undermined the integrity or public reputation of judicial proceedings" (internal quotation marks omitted)).  The

---

vessel willingly and with the intent to transport the drugs for profit."

[31] Rodríguez-Durán's counsel did object when the government referred to the statement in the initial portion of its closing argument.  After stating that Tejeiro had hired all of the defendants, the prosecutor described him as "[t]he man who we know from Morelis approached him in Curaçao and told him there was going to be illegal drugs coming on the ship and offered him $40,000." In response to the objection, the court held a bench conference, after which Rodríguez-Durán's attorney moved for a mistrial on the ground that, "based on Bruton," the court had not allowed Morelis's statement about the $40,000 into evidence.  The court reviewed the transcript of Agent Santiago's testimony – presumably discovering that the prosecutor's comment was based on admitted testimony – and then overruled the objection.  As articulated, Rodríguez-Durán's counsel's objection was not a Bruton objection.  Instead, he claimed incorrectly that the evidence cited by the government had not been admitted.

-44-

statement at issue here – that Tejeiro told Morelis that the *Sea Atlantic* would carry an illegal load, for which a $40,000 payment would be made – overlaps substantially with Rodríguez-Durán's own testimony that Tejeiro told him both about the original plan to transport drugs concealed in asphalt drums and the subsequent change to pick up contraband at sea. The additional fact of a payment offer to Morelis does not contradict Rodríguez-Durán's personal duress defense. The captain's compliance could have been secured by means of threats notwithstanding the offer of a reward to Morelis to persuade him to join the crew. Moreover, a payoff at the end even to Rodríguez-Durán is not inconsistent with the undertaking being performed under duress.

The most damaging aspect of the statement for both defendants is that it conflicted with Rodríguez-Durán's testimony that none of the other crew members knew about the drugs until they were on board. While this inconsistency may have tainted their duress defense, we cannot conclude that it was a sufficiently serious defect to satisfy the plain error standard. Morelis's statement did not directly incriminate either of them. In addition, the challenged testimony included no indication that other crew members had similar conversations with Tejeiro or that Rodríguez-Durán had knowledge of Morelis's conversation. Thus, the jurors could have credited Santiago's hearsay report of the Morelis

interview without rejecting the truthfulness of Rodríguez-Durán's testimony about the crew members' ignorance.

Moreover, the government's case against these two defendants was otherwise strong. Incriminating papers were found in each of their berths, and the list of code words found in Cabello's room contained code names for both him and Rodríguez-Durán. Their positions as captain and first officer reinforced the documentary evidence suggesting that they were willing participants, and the paper found in Cabello's berth with Tejeiro's first names and phone numbers was particularly significant in linking him – as well as Rodríguez-Durán – to the crime's mastermind. Rodríguez-Durán testified, and the jury was thus able to appraise his credibility directly. This evidence was more than sufficient for us to conclude that there was no impact on these defendants' substantial rights.

**V.**

Six defendants claim that the district court erred in denying them the benefit of the "safety valve" provision of the Sentencing Reform Act, 18 U.S.C. § 3553(f)(1)-(5), which allows courts to impose sentences below the statutory minimum in certain drug cases.[32] The safety valve provision, also set forth at section 5C1.2 of the Sentencing Guidelines, was enacted "to mitigate the

---

[32] Those raising this claim are Morelis, Okley, Padilla, Cabello, González-Valero and Almonte.

harsh effect of mandatory minimum sentences on certain first offenders who played supporting roles in drug-trafficking schemes," United States v. Ortiz-Santiago, 211 F.3d 146, 150 (1st Cir. 2000). To qualify for a safety valve reduction, a defendant must satisfy five criteria, including that he truthfully provided the government with all information and evidence he possesses about the offense. 18 U.S.C. § 3553(f)(5); see also Bravo, 489 F.3d at 11-12. It is undisputed that these defendants have satisfied the other safety valve requirements,[33] and the only issue before us is whether the district court properly found that the defendants failed to make truthful and complete disclosures to the government, United States v. Bermúdez, 407 F.3d 536, 542 (1st Cir. 2005).

Whether a defendant is eligible for safety valve relief is determined by the district court at sentencing, United States v. White, 119 F.3d 70, 73 (1st Cir. 1997), and we review the district court's factual findings on that question for clear error, United States v. Rodríguez-Ortiz, 455 F.3d 18, 25 (1st Cir. 2006). Such review is "'extremely deferential,'" Bermúdez, 407 F.3d at 542 (quoting United States v. Marquez, 280 F.3d 19, 26 (1st Cir. 2002)), and "'an appellate court ought not to disturb either

---

[33] The four other requirements are that the defendants not have more than one criminal history point, did not use violence or a dangerous weapon in the offense, no death or serious bodily injury resulted from the offense, and defendants were not in a supervisory role (or engaged in a continuing criminal enterprise). 18 U.S.C. § 3553(f)(1)-(4).

findings of fact or conclusions drawn therefrom unless the whole of the record compels a strong, unyielding belief that a mistake has been made,'" id. (quoting United States v. Matos, 328 F.3d 34, 40 (1st Cir. 2003)).  It is the defendants' burden to prove that safety valve relief is warranted.  Id.

The district court conducted nine back-to-back sentencing hearings for the defendants, for the most part relying in the later proceedings on the explanations that it previously had given for its conclusions.  At the first hearing, Almonte's, the government argued that the defendants were not entitled to the safety valve benefit because they had clung to the same duress story they presented at trial.  Quoting from the Seventh Circuit's decision in United States v. Thompson, 106 F.3d 794 (7th Cir. 1997), the government asserted that defendants' adherence to "a false version of events and disput[ing] their own culpability, up to and including the sentencing hearing, is a sufficient basis for refusing to invoke the safety valve provision."  Id. at 801. Almonte's counsel responded that the defendants did not change their story because it was true, and he argued that the acquittals on the conspiracy count meant that "the jury believed that [defendants] learned about the drugs when they were in the high seas" – thus validating what the defendants said in their debriefings.

The district court rejected the defense view of the jury's verdict, telling counsel: "I don't think your argument holds water." The court concluded that, "[u]nder these circumstances" and in light of the government's "solid argument," it would not grant either the safety valve reduction or an adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. It repeated that ruling for each of the other defendants who sought safety valve benefits, elaborating on its conclusion in response to Minoungou's argument that the jury's rejection of the duress defense did not foreclose the court from reaching a different outcome:

> But the problem with this is what the 7th Circuit said in that case. It is simply this, the safety valve cannot be an automatic two point downward adjustment for the mere fact that be[cause] someone goes to an interview and sits down and says exactly what the theory of the defense was that was not accepted. There must be something more than that. There must be some acceptance of the facts and some explanation and recital of how is it that it happened. Some sort of mini confession, if you will. That is what the guidelines require. It is not a full cooperation. It is not expected that he will go and give all the information that nobody would expect him to have, but there must be that.
>
> . . .
>
> . . . I am not going to make a mockery out of the safety valve situation. The truth of the record is there is nothing on the record that suggests to me that I should grant the safety valve [] when there is not even a minimal contribution of the facts of how this happened with what is consistent of what I

heard happened in this trial. A small boat, a small number of crew members. It is unbelievable.

On appeal, defendants argue that the government presented no evidence establishing that they did not provide full, truthful information in their debriefings and that the court likewise failed to particularly identify instances of false or inconsistent statements or omissions. In effect, defendants argue that the court did not make the required independent factual assessment of their proffers to the government.

Although safety valve cases may involve detailed examination of a defendant's trial testimony and proffer, and specific factual findings comparing the consistency of various statements, see, e.g., Bermúdez, 407 F.3d at 542-43; Marquez, 280 F.3d at 23; White, 119 F.3d at 74, such specificity is not always required. We have observed that, while particular factual findings are preferable, "a district court may rest its decision on conclusory statements if those conclusions have 'easily recognizable support in the record,'" Bravo, 489 F.3d at 12 (quoting United States v. Miranda-Santiago, 96 F.3d 517, 529 (1st Cir. 1996)). In addition, the government is not required to offer objective rebuttal evidence to show that a defendant has been "untruthful or unforthcoming." Marquez, 280 F.3d at 24.

In this case, the district court's ruling was undetailed, but specific. It found the defendants' trial defense of duress,

which was repeated in their safety valve proffers, not credible, and thus concluded that it had no basis for awarding them credit for full, truthful disclosure.  Although the defendants assert that the jury's verdict supported their defense, we already have noted the flaw in that assumption.  See supra note 17.  Having heard all of the evidence presented at trial, the court had intimate familiarity with the case.  It not only was aware of the inconsistencies in the information provided at various times by Rodríguez-Durán – on whose credibility the case turned – but it also could take into account the expert testimony that drug traffickers would not entrust such a valuable cargo to unknowing collaborators.  Thus, the factual background developed at trial provided both context and an adequate foundation for the court's rejection of defendants' credibility.  Indeed, all of the evidence that allowed the jury to find defendants guilty of aiding and abetting the drug transport implicitly played a role in the court's disposition of the safety valve issue.  We therefore find no error in its refusal to grant the safety valve reduction.[34]

---

[34] Defendants Padilla and Almonte also argue that the court erred in denying their request for a sentence reduction based on acceptance of responsibility under U.S.S.G. § 3E1.1(a).  In rejecting defendants' assertion of duress – a conclusion that, as we have explained, was supported by the evidence – the district court effectively found that they had not accepted responsibility for their participation in the crime.  Cf. United States v. Bello, 194 F.3d 18, 28 (1st Cir. 1999) ("An assertion of self-defense is a denial of an essential factual element of guilt for the purposes of [§ 3E1.1].").  We therefore detect no clear error in its ruling that Padilla and Almonte did not establish entitlement to an

**VI.**

Defendants Cabello and González-Valero each raise two additional claims of error, none of which warrants extended discussion. We address each in turn.

## A. Cabello's Claims

### 1. Failure to Admit Proof of Certification

Cabello claims that the document certifying Bolivia's consent to the Coast Guard's boarding of the *Sea Atlantic* was marked as an exhibit but never formally introduced into evidence. Bolivia's consent was necessary to establish United States jurisdiction over the vessel, and Cabello argues that, without the certification, there was insufficient evidence to support his conviction. Because Cabello did not raise this issue in the district court, it is subject to review only for plain error. See United States v. Pratt, 496 F.3d 124, 127 (1st Cir. 2007). We find no such error.

---

acceptance-of-responsibility decrease in their offense levels. See generally United States v. Baltas, 236 F.3d 27, 38 & n.7 (1st Cir. 2001) (affirming denial of § 3E1.1(a) reduction where defendant persisted through appeal in denying that he agreed to participate in the drug conspiracy for which he was convicted).

Even if the document was technically not admitted,[35] its content was introduced into evidence through the testimony of USCG Officer Cieblik, who identified the document as the "agreement between the government of Bolivia and the United States government to allow us to board the vessel *Sea Atlantic*." The defendants had the opportunity to cross-examine Cieblik concerning the document's authenticity, but did not. The issue of jurisdiction was for the district court to decide, 46 U.S.C. app. § 1903(f); Bravo, 489 F.3d at 8. We have no doubt that, given Cieblik's testimony and the availability – if not admission – of the certification, no plain error occurred.

2. Failure to Impose Reasonable, Individualized Sentence

Cabello, who was convicted of both the conspiracy and aiding and abetting counts, was sentenced to 235 months' imprisonment, which was the low end of the applicable guidelines range. His counsel requested a three-year sentence based on his particular circumstances. On appeal, Cabello argues that the district court erred in failing to give him the benefit of various mitigating factors, including his status as both an alien and first-time offender, and his age (63), arguing that these

---

[35] Although no explicit statement admitting the certification appears in the transcript, the court's exhibit list indicates that it was admitted on the first day of trial. The court told the jurors during its closing instructions that they would have the exhibits for their deliberations, and the certification presumably was included among them.

conditions make a lengthy prison term less appropriate or more arduous than in other cases.[36] He asserts that the court's strict application of the guidelines, without giving him credit for these factors, denied him an individualized sentence and thus was unreasonable and in contravention of 18 U.S.C. § 3553(a)(2).[37]

Challenges to the reasonableness of a sentence are reviewed with deference to the district court's determination. United States v. Dixon, 449 F.3d 194, 204 (1st Cir. 2006). If the court has made no legal error and "has offered a plausible explication of its ultimate sentencing decision, we are quite respectful of that decision." Id. Although Cabello's sentence is substantial, it reflects the seriousness of the crimes of which he was convicted. He was found guilty of two charges involving transport of nearly 2,000 kilograms of cocaine, and significant inculpatory evidence was found in his berth. The court noted that the amount and type of narcotics involved triggered a base offense

---

[36] For example, he contends that his age makes him more vulnerable to abuse from other prisoners and his alien status denies him opportunities for early release, community confinement and minimum security placement.

[37] Section 3553(a) directs courts to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing listed in the statute, including deterrence, protecting the public from the defendant's further criminal behavior and reflecting the seriousness of the offense. 18 U.S.C. § 3553(a)(2).

level of 38,[38] and there were no adjustments to which Cabello was entitled. Finding no justification for varying from the guidelines, the court imposed the bottom term within the applicable range. Although even that low-end sentence could result in his incarceration to age 82, advanced age typically is deemed relevant in determining whether a departure is warranted only when the offender is "elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. § 5H1.1. We do not consider a 63-year-old to be "elderly" for purposes of sentencing, and there is no indication that Cabello is infirm or that home confinement would be an appropriate substitute for incarceration. Consequently, section 5H1.1 is inapplicable.

In sum, the district court imposed a sentence that reflects the severity of the crime and reasonably rejected any deviation from the guidelines. We find no reversible error.

---

[38] Cabello argues that the court should have sentenced him under 21 U.S.C. § 960(b)(2)(B)(ii), which provides for a statutory minimum sentence of five years rather than the ten years provided by § 960(b)(1)(B)(ii). Section 960(b)(2)(B)(ii) is triggered when the crime involves 500 grams or more of cocaine and § 960(b)(1)(B)(ii) is triggered when the violation involves five kilograms or more of cocaine. Here, more than 1,800 kilograms were at issue, and there is no basis for attributing less than the full amount to Cabello.

**B. González-Valero's Claims**

1. Courtroom Seating

Throughout the trial, the defendants were seated in the first two rows of the courtroom rather than at the defense table with their attorneys. On the second day of trial, González-Valero submitted an emergency motion stating that he could not communicate effectively with his attorney and requesting that he be seated beside counsel so that he could "interact and communicate regarding the evidence presented to fully exercise his rights to effectively confront and cross-examine testimony presented against him." The next day, González-Valero's counsel asked the court if another table could be obtained because "[i]t is difficult to communicate." The judge responded that he already had spoken with the marshals and that another table would not fit. The court then said: "Counsel, you can communicate."

González-Valero contends that his distance from his attorney deprived him of his Sixth Amendment right to the effective assistance of counsel, and he argues that the district court abused its discretion in failing to either probe his claim of inadequate communication or make alternative arrangements. See United States v. Balsam, 203 F.3d 72, 82 (1st Cir. 2000) (noting that courtroom seating arrangements for defendants and counsel are reviewed for abuse of discretion).

We previously have concluded that seating five co-defendants in the first row of a courtroom's spectator section because of limited space in the courtroom did not significantly impede the defendants' Sixth Amendment right to consult with counsel. Id.; see also United States v. Larson, 460 F.3d 1200, 1216 (9th Cir. 2006)[39]; United States v. Sorrentino, 726 F.2d 876, 887 (1st Cir. 1984) ("Where special circumstances, such as the number of defendants, make it impractical for defendants to sit at the counsel table, 'as is ordinarily the case,' the seating arrangement is necessarily 'a matter best left to the discretion of the trial court.'" (quoting United States v. Turkette, 656 F.2d 5, 10 (1st Cir. 1981))). Although we noted in Balsam that the court had "assured the defendants that they could consult freely with their attorneys as they wished, either by walking the short distance to the defense table, or passing written notes," 203 F.3d at 82, defendant does not complain that he was prevented from using such techniques here. He identifies no particular instance in which he was unable to communicate effectively with counsel. With nine defendants and nine separate counsel, and in the absence of any indication of actual prejudice, we cannot conclude that the

---

[39] The Ninth Circuit reheard the Larson case en banc, but adopted the three-judge panel's disposition of this issue. See United States v. Larson, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (en banc).

court abused its discretion in seating the defendants immediately behind, rather than beside, their attorneys.

2. Prison Clothing

González-Valero also claims that he was compelled to wear prison clothing for the first three days of the five-day trial,[40] in violation of his constitutional right not to be forced to wear "identifiable prison garb" in court, United States v. Pina, 844 F.2d 1, 8 (1st Cir. 1988). See also Estelle v. Williams, 425 U.S. 501, 512 (1976) (holding that an accused may not be compelled to stand trial before a jury while dressed in identifiable prison clothes); Moore v. Ponte, 186 F.3d 26, 35 (1st Cir. 1999) (explaining that compelling a defendant "to attend trial in prison or jail clothing . . . could impair the presumption of innocence") (citing Williams, 425 U.S. at 504-05). Defendant asserts that he first filed a motion asking that he be allowed to wear civilian clothing on October 23, 2005 – the day before the trial started. Receiving no response, he filed a second motion on October 25, after trial had started. That motion was granted the same day.

A due process violation occurs not from an accused's appearance in prison clothes but from the compulsion that he so appear. Williams, 425 U.S. at 512-13. Neither in his motions nor on appeal has González-Valero established or argued that he was

---

[40] The assertion of "three days" is apparently incorrect; defendant reports that he received permission to wear civilian clothing on the second day of trial.

-58-

forced to wear prison clothing; his second motion simply "request[ed] that he be provided the opportunity to appear . . . in civilian dress." He equates the court's failure to respond to his initial motion with a compulsion that he wear prison attire, but there is no basis for a conclusion that he was prevented from wearing the clothing of his choice. Moreover, his second motion noted that the defendants wore khaki pants and "shirts provided by the marshals," clothing that is neither stereotypical prison attire nor - so far as the record indicates – indicative of his prisoner status. Cf. Felts v. Estelle, 875 F.2d 785, 785-86 (9th Cir. 1989) (finding due process violation where defendant compelled, during the first six days of trial, to wear a jumpsuit labeled in two places "L.A. County Jail"). Thus, defendant has failed to establish constitutional harm from the clothing he wore at trial.

## VII.

Unquestionably, counsel for the nine defendants in this case faced a formidable challenge: to prepare for a trial that began less than two months after their clients were arrested on serious drug trafficking charges. Despite the challenge, we cannot conclude that the district court abused its discretion in refusing to postpone the trial; defendants have identified no particular prejudice from the denial of their motions for continuance. The related claim that the trial court's schedule violated the Speedy Trial Act was waived. Nor did we find a lack of evidence to

support the jury's verdicts of guilt.  The defendants placed their fates largely in their captain's hands, and the jury evidently doubted his credibility and the duress defense that he presented. Although Morelis's statement to Agent Santiago was improperly admitted without a limiting instruction, no request or objection was made by the defendants and no plain error occurred.  The district court supportably found that defendants were not entitled to the safety valve benefit in sentencing in light of their adherence to the discredited duress defense.  Nor did we find merit in any of the other claims.

**Affirmed.**