# United States Court of Appeals
## For the First Circuit

Nos. 07-2428; 07-2453; 07-2460; 07-2497

UNITED STATES OF AMERICA,

Appellee,

v.

ALBERTO ANGULO-HERNÁNDEZ; EUSEBIO ESTUPINAN-ESTUPINAN;
GUSTAVO RAFAEL BRITO-FERNÁNDEZ; JOSÉ LUIS CASIANO-JIMÉNEZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

Rafael Anglada-López for appellant Alberto Angulo-Hernández.
Jorge E. Rivera-Ortíz for appellant Eusebio Estupinan-Estupinan.
Jedrick H. Burgos-Amador for appellant Gustavo Rafael Brito-Fernández.
Frank D. Inserni-Milam for appellant José Luis Casiano-Jiménez.
Germán A. Rieckehoff, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief for appellee.

May 5, 2009

**LYNCH**, **Chief Judge**.  Responding to the "serious international problem" of maritime drug smuggling, 46 U.S.C. § 70501, Congress enacted the Maritime Drug Law Enforcement Act ("MDLEA") in 1980.  Congress intended the MDLEA to address this "specific threat to the security and societal well-being of the United States," id., by providing for the enforcement of our drug laws outside the territorial jurisdiction of the United States, id. § 70503(b).  In particular, the MDLEA expanded the drug enforcement jurisdiction of the United States to include, inter alia, vessels "registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States."  Id. § 70502(c)(1)(C).  Appeals from prosecutions in the District of Puerto Rico under the MDLEA for drug trafficking in the Caribbean are frequent in this court.  See, e.g., United States v. Vilches-Navarette, 523 F.3d 1 (1st Cir. 2008); United States v. Cardona-Sandoval, 518 F.3d 13 (1st Cir. 2008) (per curiam); United States v. Rodríguez-Durán, 507 F.3d 749 (1st Cir. 2007); United States v. Gil-Carmona, 497 F.3d 52 (1st Cir. 2007); United States v. Bravo, 489 F.3d 1 (1st Cir. 2007).

In this case, the U.S. Coast Guard intercepted a shipment of 400 kilograms of cocaine and 25 kilograms of heroin -- worth several million dollars -- onboard a boat traveling from Colombia to the Dominican Republic.  A jury convicted the captain and three crewmen from that boat both of aiding and abetting drug possession

-2-

with intent to distribute and of a related conspiracy charge in federal court in Puerto Rico. That same jury acquitted three other crewmen. Another crewman was tried and convicted separately.

The convicted defendants' sentences ranged from 360 months' imprisonment for the captain to 151 months' imprisonment for two of the crew members. On appeal, defendants challenge the sufficiency of the evidence offered in support of those convictions, along with various other aspects of their trial and sentences. We affirm.

## I.

On February 4, 2007, the Coast Guard cutter Tahoma was patrolling in international waters approximately 100 miles north of the South American shoreline along the border between Colombia and Venezuela. It came upon the Osiris II, a 120-foot Bolivian flag vessel, sitting dead in the water.

This was not the Coast Guard's first encounter with the Osiris II. In November 2006, the Coast Guard boarded the Osiris II when the boat was experiencing engine problems after leaving Colombia en route to the Dominican Republic. The Coast Guard diverted the Osiris II to Puerto Rico, where it inspected the boat for drugs using dogs and divers. Although the Coast Guard did not then find any drugs onboard, it considered the Osiris II a "suspect" vessel.

This time, the Osiris II again appeared to be having propulsion problems. The crew of the Tahoma contacted the Osiris II to offer assistance. The Osiris II's captain, defendant Eusebio Estupinan-Estupinan, explained that his boat's main engine was not working. He initially declined the Coast Guard's offer of help, saying that a tugboat was on its way. But after the Coast Guard explained that it had mechanics onboard who could look at the boat's engine, Estupinan-Estupinan accepted the Coast Guard's offer and invited the Tahoma's crew to board his vessel. Before boarding, the Coast Guard obtained permission from the Bolivian government under the MDLEA to board and search the Osiris II.

Once onboard, the Coast Guard's boarding team performed an initial safety inspection. Finding no safety hazards, they then did an at-sea space accountability assessment of the vessel. The purpose of this search was to ensure that the boat did not contain any contraband or firearms.

The Coast Guard searched the Osiris II over the course of several days. Estupinan-Estupinan remained in the pilot house while the boarding team conducted its search. The other seven members of the Osiris II's crew -- including defendants Alberto Angulo-Hernández, Gustavo Rafael Brito-Fernández, and José Luis Casiano-Jiménez -- stayed on the main deck, where they were guarded by two members of the boarding team.

While searching a closet onboard the Osiris II, Coast Guard petty officer Sean Andrus discovered a kilogram of a tannish powder in a trash bag. The substance field-tested positive for heroin. At trial, however, the parties stipulated that subsequent laboratory testing revealed that the powder was not a controlled substance. Andrus secured the area and gathered the Osiris II's crew in one of the boat's staterooms. Although he did not then disclose his discovery to the Osiris II's crew, Andrus observed that they appeared "a little bit nervous at that point in time." And the longer that the Coast Guard spent searching the boat, the more nervous the crew members became. Andrus noted that the crew members appeared especially nervous when, several days later, he and his team searched the rear portion of the boat.

Searching further, Andrus found a small bag of what appeared to be cocaine and a tan leafy substance, which field-tested positive for heroin, in the engineer's stateroom. The boat's engineer was defendant Angulo-Hernández. Again, the parties stipulated at trial that subsequent laboratory testing showed that these items were not controlled substances.[1]

Having already found smaller quantities of substances that field-tested positive for cocaine and heroin onboard the

---

[1]    Unfortunately, the government's brief to us misrepresented the evidence presented at trial, saying that "drugs -- cocaine and heroin -- were found in two (2) of the staterooms, including the engineer's stateroom." The stipulation at trial contradicts this assertion.

Osiris II, Andrus continued to search the boat for a larger drug stash. He had suspected that the boat's primary purpose was to smuggle drugs because its legitimate cargo -- 28,011 rolls of toilet paper, 207 Styrofoam coolers, and 14 pieces of office furniture, which according to the boat's invoice were together worth approximately $25,000 -- was, in his view, insufficient to make the voyage profitable. Beyond that, the boat's cargo was not stored in a manner consistent with the practices on a typical commercial vessel. Instead of being stored neatly in boxes or on pallets, the cargo, including some of the toilet paper, was left free to move around the cargo hold, potentially making the boat unstable and threatening to destroy the value of the cargo.

On February 9, 2007, only one portion of the boat remained for the Coast Guard to search -- a space toward the rear of the vessel around the aft lube oil tank. Andrus attempted to enter this space through the crew's living quarters. Andrus removed the rubber matting from the floor, revealing a layer of plywood beneath it. The plywood contained a rectangular seam measuring two feet by four feet. When Andrus could not remove the plywood with a crowbar, he cut a hole in the wood, striking the boat's steel deck four inches below. Andrus then removed two layers of plywood, exposing a metal hatch screwed into the deck with new-looking screws. Upon removing the screws, the hatch lifted up easily from the deck. The space below contained several

plastic bags. In one bag, the Coast Guard found a .380-caliber MAC-10 submachine gun, a fourteen-round loaded magazine, and a silencer for that weapon. The other bags contained approximately 400 bricks of cocaine and 25 bricks of heroin. These drugs would have had a street value of approximately $8 million in Puerto Rico.

The boarding team immediately arrested the Osiris II's entire crew. Andrus testified: "Once we detained them, put them in handcuffs, their mood changed drastically. They seemed dejected. They hung their heads low. They just knew they were caught." This testimony is a subject of these appeals. The Coast Guard then towed the Osiris II to San Juan, Puerto Rico.

On April 4, 2007, all eight persons onboard the Osiris II were charged in a three-count superseding indictment with (1) conspiracy to possess with intent to distribute the drugs seized from the boat, see 46 U.S.C. § 70506(b); (2) aiding and abetting drug possession with intent to distribute, see 18 U.S.C. § 2(a); 46 U.S.C. § 70503(a)(1); and (3) aiding and abetting possession of a machine gun, see 18 U.S.C. §§ 2(a), 924(c)(1)(B)(ii).

After a six day trial, a jury convicted Angulo-Hernández, Estupinan-Estupinan, Brito-Fernández, and Casiano-Jiménez on all three counts. The jury acquitted the other three crew member co-defendants. The eighth crew member of the Osiris II was tried separately and convicted on all three counts. At sentencing, the

-7-

district court granted a judgment of acquittal as to the gun possession charge for each defendant. Defendants timely appealed from their convictions. Angulo-Hernández and Estupinan-Estupinan also contest their sentences on appeal.

## II.

A.        Sufficiency of the Evidence

All defendants challenge the sufficiency of the evidence. Where, as here, the defendant has preserved his sufficiency challenge by moving for a post-verdict judgment of acquittal, our review is de novo. United States v. Carrasco, 540 F.3d 43, 49-50 (1st Cir. 2008). We review the evidence in the light most favorable to the government, drawing all reasonable inferences consistent with the jury's verdict. Id. at 50. "If a reasonable jury could have found that the government had proven each element of the crime beyond a reasonable doubt, we will affirm the conviction." Id. We do not atomize our analysis. "[W]e 'consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence.'" United States v. Lee, 549 F.3d 84, 92 (2d Cir. 2008) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)); see also United States v. Roberson, 459 F.3d 39, 47 (1st Cir. 2006).

Defendants argue that they are entitled to a judgment of acquittal because three of their co-defendants were acquitted, even though, they assert, the "evidence presented by the government and

-8-

the defendants was exactly the same as to all of the seven defendants." This argument misses the point. The pertinent question is whether a reasonable jury could have found these defendants guilty beyond a reasonable doubt based upon the evidence presented. What the jury ultimately decided as to their similarly situated co-defendants is not relevant. Cf. United States v. Powell, 469 U.S. 57, 67 (1984) (recognizing that review of a sufficiency challenge "should be independent of the jury's determination that evidence on another count was insufficient"). Even if we were to view this as an inconsistency in the jury's verdict, which we do not, that is not a basis for overturning a conviction that is sufficiently supported by the evidence. See United States v. DeCologero, 530 F.3d 36, 69 (1st Cir. 2008).

Here, the evidence offered was more than sufficient to support each of the defendants' convictions. To prove guilt on the aiding and abetting drug possession charge, the government needed to show beyond a reasonable doubt that the defendants participated in the drug venture and sought by their actions to make it succeed. Rodríguez-Durán, 507 F.3d at 758-59. Specifically, a violation of 46 U.S.C. § 70503(a)(1) requires proof that (1) the defendants' vessel was subject to the jurisdiction of the United States, (2) the material found onboard the boat was a controlled substance, and (3) the defendants knowingly or intentionally possessed the drugs

-9-

with the intent to distribute them. Rodríquez-Durán, 507 F.3d at 759.

Defendants focus on the third prong, arguing that the government proved only their mere proximity to the drugs, which was insufficient to support their convictions. Of course, a defendant's mere presence at the scene of the crime alone is generally insufficient proof of his participation in the crime. United States v. Guerrero, 114 F.3d 332, 342 (1st Cir. 1997). But this is not a "mere presence" case; the evidence strongly indicates that the convicted defendants knew about the drugs onboard the Osiris II.

The evidence against Estupinan-Estupinan, the boat's captain, is particularly strong. "[J]uries may reason that a captain normally knows what his ship contains." Carrasco, 540 F.3d at 50 (alteration in original) (quoting United States v. Steuben, 850 F.2d 859, 865 (1st Cir. 1988)). Here, the evidence presented supports this common sense conclusion. For example, the Coast Guard found a sketch of the Osiris II in the captain's quarters with a mark indicating where the drugs were hidden. And Estupinan-Estupinan initially refused help from the Coast Guard, even though his boat's engine had failed in the open water. A jury could reasonably infer that his reluctance was motivated by a desire to keep the Coast Guard from discovering the drugs onboard his boat. Moreover, Estupinan-Estupinan did not run his boat in a manner

consistent with a commercial shipping operation.  The boat's legitimate cargo was carelessly stowed in the hold, potentially compromising both the stability of the boat and the integrity of the cargo.[2]  Based upon the evidence presented, a reasonable jury could easily have found that Estupinan-Estupinan knew there were drugs on his boat.

The government also presented sufficient evidence to sustain the convictions against crew members Brito-Fernández and Casiano-Jiménez.  Supporting factors may include "the length of the voyage, the size and condition of the vessel, the quantity of [drugs aboard], and the absence of a legitimate purpose for the voyage."  Carrasco, 540 F.3d at 50 (alteration in original) (quoting Guerrero, 114 F.3d at 342).  Here, the Osiris II was on a voyage between Colombia, a primary source of drugs, and the Dominican Republic.  A large quantity of drugs was seized from a hidden compartment accessible through the crew's berthing area.  The quantity of drugs seized itself suggests strongly that each of the crew members knew about the boat's drug smuggling purpose because "drug traffickers would not entrust a multi-million-dollar shipment to anyone in whom they did not have confidence."  Rodríguez-Durán, 507 F.3d at 760; see also Guerrero, 114 F.3d at

---

[2]     Other items seized from the boat suggest that Estupinan-Estupinan was not running a legitimate business.  For example, Estupinan-Estupinan kept his captain's log in a child's notebook, which had trucks on the cover and the title "Super Trucks."

-11-

344 ("[U]nwitting bystanders would not have been hired to participate in the [boat's] obvious illegal transport of millions of dollars' worth of contraband); United States v. Piedrahita-Santiago, 931 F.2d 127, 131 (1st Cir. 1991); United States v. Cuevas-Esquivel, 905 F.2d 510, 515 (1st Cir. 1990) ("It is entirely reasonable for the jury to conclude the conspirators, engaged in conduct which by its nature is kept secret from outsiders, would not allow the presence of innocent bystanders."). And the practical difficulties involved with concealing such a quantity of drugs makes it unlikely that the crew members were unaware of the drugs onboard the boat. See Carrasco, 540 F.3d at 51.

Beyond that, the screws on the hatch leading to that compartment were not tarnished, indicating that the space had been sealed shut recently. This evidence is probative of the crew members' knowledge of the drugs because the more recently that the drugs were placed onboard the boat, the more likely it is that the crew members either witnessed the loading or participated in it.

Finally, a reasonable jury could have concluded that the crew members knew the purported legitimate purpose of the voyage was a ruse, given the self-evident low value of the cargo and the unprofessional manner in which it was transported. Indeed, as even the defendants' only witness acknowledged, the toilet paper was stored in a manner that could have destroyed its value, making it

obvious that the boat's primary purpose was something other than delivering toilet paper. The evidence in total was sufficient for a jury to conclude the crew members knew of the Osiris II's drug smuggling purpose.

The evidence demonstrating the other crew members' guilt applies with equal force to Angulo-Hernández, the boat's engineer. But one additional fact makes the government's case against Angulo-Hernández even stronger. Angulo-Hernández had been on a previous crew list for the Osiris II, making it even more unlikely that he was unaware of the boat's secret compartment and its contents. His sufficiency claim also fails.

Likewise, because the jury could have found that each defendant had knowledge of the drugs onboard the Osiris II, it could have inferred that they had agreed to transport the drugs for the purpose of distributing them at their destination, which is the essence of the conspiracy charge. See Carrasco, 540 F.3d at 51.

B.      Lay Opinion Testimony

All defendants challenge the admission of Andrus's testimony regarding the crew's demeanor when they were arrested. Specifically, Andrus testified: "Once we detained them, put them in handcuffs, their mood changed drastically. They seemed dejected. They hung their heads low. They just knew they were caught." Defendants argue that Andrus's statement was not properly admissible as a lay opinion under Fed. R. Evid. 701.

Even assuming without deciding that Andrus offered an improper lay opinion, any possible error was harmless. A non-constitutional evidentiary error is harmless if it is "highly probable that the error did not influence the verdict." Roberson, 459 F.3d at 49 (quoting United States v. Flemmi, 402 F.3d 79, 95 (1st Cir. 2005)). Here, the district court immediately clarified that Andrus's statement should be interpreted as a statement about the defendants' visible frustration at the situation, which is a permissible subject of lay opinion testimony. See 29 Wright & Gold, Federal Practice and Procedure § 6255, at 160 (1997) ("[L]ay opinion traditionally has been received as to the mental, emotional or physical condition of a person observed by the witness."). The district court then minimized the force of Andrus's statement by stating that it was merely Andrus's interpretation of the situation. These efforts, coupled with the weight of the evidence against the convicted defendants, convince us that any error that may have occurred here was harmless.

C.      The District Court's Questioning of Witnesses and Commentary During the Trial

Each of the four defendants complains that he was seriously prejudiced by various instances of the district court's questioning of witnesses and commentary during the trial.[3] They

_____

        [3]      To give a few examples, defendants argue that the district court improperly commented on Andrus's testimony regarding the change in the crew members' moods upon their arrest. Specifically, when responding to defense counsels' objection to

-14-

argue that the district court's participation in trial demonstrated a bias in favor of the government.  On balance, we reject their arguments.

---

Andrus's testimony on the basis that he lacked personal knowledge of the crew members' moods, the district court said: "Well, obviously, he was the one who caught them.  So how can you say that?  The mood changed drastically."

Later, on cross-examination, defense counsel asked Andrus: "So your main objective that afternoon . . . was not to go help the captain with the mechanics of the vessel?  Yes or no?"  Andrus responded:  "I can't answer that yes or no, sir.  I have to explain it."  When defense counsel persisted in trying to make Andrus give a yes or no answer, the district court said to Andrus: "There is no question about the fact that your mission was not necessarily being a Good Samaritan.  You had a law enforcement mission."  Andrus replied: "Yes, sir."  The district court then said: "There you go."

Defendants also claim that the district court frequently interrupted the testimony of their only witness, José L. Rivera, a harbor pilot.  In particular, when the government was cross-examining Rivera regarding the common practices for storing cargo on a boat, the following exchange occurred:

> THE COURT:     Isn't it a fact that, usually, this kind of commodity is packed in cardboard boxes or in pallets?  Otherwise, you are going to ruin it.
>
> THE WITNESS:   Well, Your Honor, they normally come in -- from what we see in the United States, they come in boxes.  This one is wrapped in, obviously, plastic.  So it could have been that one of the packets opened or ruined and the other stuff was loose and unprotected.
>
> THE COURT:     It is not the typical arrangement you would find a commercial cargo intended for commercial purposes?
>
> THE WITNESS:   No.

"[A] trial judge in the federal system retains the common law power to question witnesses and to analyze, dissect, explain, summarize, and comment on the evidence." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997). Yet there are limits on this power. "[T]he judge's participation must be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly." Id. "With allegations of judicial bias, we consider whether the comments were improper and, if so, whether the complaining party can show serious prejudice." DeCologero, 530 F.3d at 56.

We have carefully evaluated whether the court's rather frequent questioning and commentary crossed the line. These incidents of alleged improper participation were, on the whole, efforts by the district court to clarify testimony, respond to defense counsels' objections, determine the qualifications of expert witnesses, and expedite the trial, all legitimate purposes. We also note that the district court instructed the jury at the outset of trial that

> I am not here to lead you into a particular
> result. I am not here to insinuate to you or
> tell you what your answer should be to the
> factual questions of the case. So you should
> disregard any comment that I may make,
> anything that I may do or say that has nothing
> to do with rulings or with the applicable law.

Cf. Logue, 103 F.3d at 1046-47 (explaining that jury instructions may be "sufficient to palliate any untoward effects" of the

-16-

district court's participation in the trial). While district courts must be cautious about such intrusions, we find no prejudicial error here.

D.    Constitutional Challenge to Jurisdiction Under the MDLEA

Angulo-Hernández and Casiano-Jiménez argue that the MDLEA is unconstitutional. As best we can tell, their argument is that due process requires that the government prove a jurisdictional nexus between the defendants' criminal conduct and the United States. That argument has been rejected by this court for at least a decade. "[D]ue process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under MDLEA when the flag nation has consented to the application of United States law to the defendants." United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999). And the MDLEA itself contains no jurisdictional nexus requirement. Bravo, 489 F.3d at 7.

Here, the Coast Guard complied with the MDLEA's jurisdictional requirements by obtaining consent from the Bolivian government to enforce the laws of the United States against those onboard the Osiris II. See 46 U.S.C. § 70502(c)(1). This was proven in court through a certificate from the U.S. State Department. See id. § 70502(c)(2) ("Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States . . . is proved conclusively by certification of the

-17-

Secretary of State or the Secretary's designee."). The defendants' jurisdictional challenge is meritless.

Defendants also argue on appeal that the MDLEA violates the Confrontation Clause because it allows jurisdiction under the statute to be proven conclusively through a certificate from the State Department without allowing the defendants an opportunity to cross-examine the certifying declarant. See id. § 70502(c)(2)(B). Jurisdiction under the MDLEA is not an element of the offense; it is a "preliminary question[] of law to be determined solely by the trial judge," id. § 70504(a); see also Vilches-Navarrete, 523 F.3d at 20.

Here, the prosecution asserted that there was jurisdiction under the MDLEA through a motion in limine, which included the State Department's certificate as an attachment. The prosecution's motion recognized that jurisdiction under the MDLEA is "not an issue that should be litigated during trial or before the jury." The district court agreed and ultimately rejected, before trial, the defendants' jurisdictional challenge.

Despite this ruling, defendants persisted at trial in contesting the district court's jurisdiction under the MDLEA, arguing that the State Department's certificate lacked sufficient indicia of reliability. In response, the government offered the State Department's certificate as a trial exhibit, which the

district court accepted over the defendants' hearsay objection. Defendants did not object on Confrontation Clause grounds.

The district court later instructed the jury that "as a matter of law, . . . the Motor Vessel Osiris II was subject to the jurisdiction of the United States." Following that instruction, defendants renewed their objection to giving the jury a copy of the State Department's certificate, presumably on the same ground of inadmissible hearsay. The district court overruled their objection. Defendants again never objected to the admission of the State Department's certificate under the Confrontation Clause. Our review of their newfound appellate claim is for plain error. United States v. Ziskind, 491 F.3d 10, 14 (1st Cir. 2007). To meet the plain error standard, defendants must show: "(1) the occurrence of an error; (2) that the error is obvious or clear under current law; (3) that the error affected [their] substantial rights; and (4) that it seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." Id.

There was no plain error in the admission of the State Department's certificate. To start, the certificate was relevant to the jurisdictional issue before the court. It was admissible under the hearsay exception for public records, see Fed. R. Evid. 803(8), and was self-authenticating, see Fed. R. Evid. 902(1). There was no need to publish it to the jury; defendants brought

that on themselves by trying to raise the certificate as an issue at trial.

We seriously doubt that defendants can mount a Confrontation Clause challenge to the admission of the State Department's certificate. Any cross-examination of the certifying declarant would have been irrelevant because the State Department's certificate conclusively proved jurisdiction under the MDLEA. See 46 U.S.C. § 70502(c)(2)(B). For purposes of plain error review, we do not decide the Confrontation Clause question because the "error" alleged by defendants was not "obvious or clear under current law," Ziskind, 491 F.3d at 14. Defendants have cited no case which holds that a State Department certificate is testimonial within the meaning of the Confrontation Clause. Indeed, the caselaw is to the contrary. See Pandales-Angulo v. United States, No. 01-CR-294-T-17MSS, 2006 WL 1540259, at *5 (M.D. Fla. May 31, 2006).

E.      Denial of Request for Continuance

Casiano-Jiménez challenges the district court's denial of his multiple requests for a continuance. The essential argument is that the holding of trial within three months of his initial indictment was too fast to allow him to mount a defense. Our review is for abuse of discretion. DeCologero, 530 F.3d at 78-79. "We grant 'broad discretion' to a trial court to decide a continuance motion and will only find abuse of that discretion with a showing that the court exhibited an 'unreasonable and arbitrary

-20-

insistence upon expeditiousness in the face of a justifiable request for delay.'" <u>United States</u> v. <u>Rodriguez-Marrero</u>, 390 F.3d 1, 21-22 (1st Cir. 2004) (quoting <u>United States</u> v. <u>Rodriguez Cortes</u>, 949 F.2d 532, 545 (1st Cir. 1991)).

Casiano-Jiménez and his co-defendants filed five motions for a continuance because, in their view, "there had not been enough time to verify the discovery announced by the prosecution [or] to carefully examine, analyze and obtain evidence needed for an adequate defense." Specifically, Casiano-Jiménez wanted additional time to obtain "a certification by the Embassy of Bolivia to the fact that on February 4, 2007 it had not authorized the boarding by the U.S. Coast Guard."

On March 30, 2007, the government provided defendants with the State Department's certification of Bolivia's statement of no objection, which conclusively proved the Coast Guard's authority to board the Osiris II. <u>See</u> 46 U.S.C. § 70502(c)(2)(B). The defendants' trial did not start until May 7, 2007. Casiano-Jiménez has failed to explain how any additional time would have allowed him to challenge this document, and we find no abuse of discretion in the district court's decision to proceed with the trial as scheduled. <u>See</u> <u>Rodríguez-Durán</u>, 507 F.3d at 766-67 (rejecting a nearly identical challenge to a denial of a motion for a continuance).

-21-

F.        Fair Cross-Section Challenge

        Angulo-Hernández argues that he was denied his Sixth Amendment right to a jury drawn from a fair cross-section of the community because a substantial percentage of the population in Puerto Rico lacks the English language proficiency required to serve on a federal jury.  We have rejected this argument before. See United States v. Rodríguez-Lozada, 558 F.3d 29, 38 (1st Cir. 2009); United States v. González-Vélez, 466 F.3d 27, 40 (1st Cir. 2006); United States v. Dubón-Otero, 292 F.3d 1, 17 (1st Cir. 2002).  Even if we were not bound by precedent, we would reach the same result.

G.        Sentencing Issues

        Angulo-Hernández and Estupinan-Estupinan challenge their sentences.  Angulo-Hernández, the boat's engineer, received 292 months' imprisonment, a sentence at the low end of his Guidelines Sentencing Range ("GSR").  Estupinan-Estupinan, the boat's captain, received 360 months' imprisonment, a sentence in the middle of his GSR.

        Estupinan-Estupinan and Angulo-Hernández both argue that their sentencings were procedurally defective because the district court did not explain on the record its reasons for selecting the sentences it chose.  Yet explicit reasons are not needed where "a court's reasoning can . . . be inferred by comparing what was argued by the parties or contained in the pre-sentence report with

-22-

what the judge did." United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc). Here, we can infer that the district court's sentencing decision was motivated in large part by the seriousness of the offense -- a multi-million dollar drug smuggling operation involving a machine gun. And in any event, the district court provided an explanation for Estupinan-Estupinan. It said that it chose 360 months for Estupinan-Estupinan because he had two prior drug crime convictions.

Angulo-Hernández and Estupinan-Estupinan also challenge the substantive reasonableness of their sentences. We review the substantive reasonableness of their sentences under an abuse of discretion standard, considering the totality of the circumstances. United States v. Gibbons, 553 F.3d 40, 47 (1st Cir. 2009).

Estupinan-Estupinan argues that his sentence was unreasonably harsh given his age; he was 62 years old at the time of his sentencing. The district court found this factor was outweighed by the severity of Estupinan-Estupinan's current offense and history of drug crimes. "We will not disturb a well-reasoned decision to give greater weight to particular sentencing factors over others," id., and the district court here did not abuse its discretion in choosing not to exercise leniency in light of Estupinan-Estupinan's age.

Angulo-Hernández argues that his sentence was unreasonable because his co-defendant crew members received only

-23-

151 months' imprisonment and at least one of them has a criminal record similar to his.  But Angulo-Hernández did not present this argument about a sentencing disparity to the district court, and our review is for plain error.  United States v. King, 554 F.3d 177, 180 (1st Cir. 2009).  There was no error here, let alone plain error.  The evidence presented at trial indicated that Angulo-Hernández likely had a more substantial role in the conspiracy than his crew member co-defendants, given that his name appeared on a previous crew list.  Because of this difference, we cannot say that Angulo-Hernández received a disparate sentence.

III.

The defendants' convictions and sentences are affirmed.

**-Opinion Concurring in Part and Dissenting in Part Follows-**

**TORRUELLA**, <u>Circuit Judge</u> **(concurring in part and dissenting in part)**. I dissent from the majority's conclusion that the evidence was sufficient as to crew-members José Luis Casiano-Jiménez and Gustavo Rafael Brito-Fernández. I also write separately to state my conclusion that the statement "they just knew they had been caught" is inadmissible, and to note my view of the jurisdictional issue. I join the majority in affirming the conviction and sentence of engineer Alberto Angulo-Hernández and captain Eusebio Estupinan-Estupinan.

## I.  Sufficiency

Although there is no doubt that circumstantial evidence can be enough to support a conviction, the circumstantial evidence in this case is not sufficient to sustain the charges against Casiano-Jiménez and Brito-Fernández. Notwithstanding that the majority recognizes that mere presence at a location where contraband is discovered is insufficient proof of participation, it proceeds to effectively circumvent this rule by finding the evidence presented by the government here sufficient to convict crew-members Casiano-Jiménez and Brito-Fernández.

As to these defendants, the majority posits that four facts establish that the evidence was sufficient to convict them by proof beyond a reasonable doubt. Specifically, the majority reasons that (1) the ship was traveling from Colombia, a "primary source of drugs," (2) the large quantity of drugs seized shows that

-25-

the crew-members knew about the presence of the contraband, since drug traffickers would not entrust such a large shipment to those whom they did not trust, (3) the screws on the hatch leading to the compartment were not tarnished, thus showing that they were placed recently, and (4) the jury could conclude that the crew-members would know that the legitimate purpose of the voyage was a ruse since the cargo was low in value and stored haphazardly. Even considering these points, I conclude that the circumstantial evidence was insufficient as to the crew-members Casiano-Jiménez and Brito-Fernández.[4]

First, it is not proper to use the fact that the defendants and the vessel originated in Colombia in a sufficiency analysis. The nation of Colombia engages in significant legitimate trade.[5] The majority's rule sweeps too broadly in that it allows a jury to use the vessel's Colombian point of origin as evidence

---

[4] The majority states that the evidence "strongly indicates" that the convicted defendants knew of the presence of drugs. But, of course, each of these facts also equally applies to the acquitted defendants. Yet, the majority also states that it sees no inconsistency in the jury's verdict. While I agree that inconsistency in a verdict is no basis for overturning a sufficiently supported conviction, I think the majority should be consistent in its appraisal of the evidence and the verdict.

[5] At a minimum, Colombia is the world's second largest exporter of coffee. International Trade Centre, International Trade Statistics by Product Group and Country, Exports 2001-2005, http://www.intracen.org/tradstat/sitc3-3d/ep071.htm. It is also the fourth largest trading partner of the United States in Latin America. United States Trade Representative, Colombia FTA Facts (October 2008), http://www.ustr.gov/assets/Trade_Agreements/ Bilateral/Colombia_FTA/asset_upload_file901_13713.pdf.

that a crew-member must have known the vessel was involved in a drug transaction. Such an inference is based more on speculation than on a fact established in this case because such an inference is not adequately supported in the record. Further, such an inference cuts against the ideals of fairness and due process underpinning our system of justice. It stands on the same footing as saying that because defendants are Colombian they are more likely to be drug smugglers.

Second, I take issue with the majority's rule that a large quantity of hidden drugs is enough under all circumstances to permit an inference that crew-members are aware of the drugs. When taken to the degree employed by the majority this rule effectively undoes our rule that mere presence is insufficient to prove knowledge. Our cases have acknowledged that entrustment with a large quantity of drugs shows the requisite knowledge. E.g., United States v. Rodríguez-Durán, 507 F.3d 749, 760 (1st Cir. 2007) (pointing to expert evidence presented in that case to the effect that traffickers "would not entrust a multi-million-dollar shipment to anyone in whom they did not have confidence" (emphasis added)). Here, however, there is no evidence establishing that the crew was entrusted with any responsibility regarding the contraband. Rather, the evidence is consistent with the inference that the traffickers entrusted the drugs to the captain, and by allowable inference also the engineer. The facts of this case are

distinguished from Rodríguez-Durán, where other factors indicated that the crew knew about the endeavor. In fact, in that case, the captain testified that he told the crew about the drug shipment after the voyage was underway, and the crew then became involved in loading the 1854 kg of cocaine off a boat that met the defendants' ship on the high seas. Id. at 757. Thus, in Rodríguez-Durán, there was evidence showing that the crew was entrusted with responsibilities regarding the drugs. None is present here.

Moreover, the other cases relied upon by the majority are equally inapposite. In United States v. Guerrero, we stated that "unwitting bystanders would not have been hired to participate in the [boat's] obvious illegal transport of millions of dollars' worth of contraband." 114 F.3d 332, 344 (1st Cir. 1997) (emphasis added). In that case, 100 plastic-wrapped bales (later discovered to contain 5,596 pounds of marijuana) were found on board a forty-foot recreational vessel, which was equipped with sophisticated radar equipment. Id. at 335, 337. Thus, it would have been obvious to the crew that the mission was to carry suspect cargo, which was out in the open, and thus it was fair to conclude that innocent bystanders were not involved.

Similarly, in United States v. Cuevas-Esquivel, the Coast Guard recovered 2,795 pounds of marijuana that had been thrown overboard from a thirty to forty foot vessel by the crew before the Coast Guard boarded the vessel. 905 F.2d 510, 512, 515 (1st Cir.

-28-

1990). We summed up the evidence by noting that the jury could "without undue strain conclude that it was simply incredible that with only four persons on board a relatively small vessel, on its way to 'nowhere,' with an open cargo hold, surrounded by a sea of floating marihuana bales which some of the crew had been seen dumping, that all four were not participants in this criminal venture." Id. at 515. It was only in this context, that the court stated, "[i]t is entirely reasonable for the jury to conclude that conspirators, engaged in conduct which by its nature is kept secret from outsiders, would not allow the presence of innocent bystanders." Id. This statement must be read in context as meaning that in that case, where the volume of obvious marijuana was overwhelming, the defendants' claims to be an innocent bystander are unavailing. Cuevas-Esquivel does not support a rule that presence on a boat carrying a large shipment of drugs is always enough to rule one out as an innocent bystander. United States v. Piedrahita-Santiago similarly fits this pattern. 931 F.2d 127, 131 (1st Cir. 1991) (involving a small, overmanned vessel, containing 9,984 pounds of marijuana which was "not disguised or inaccessible" and concluding "[t]his court has held that a relatively small vessel carrying a large quantity of drugs is indicative of knowledge and involvement on the part of the crew"). By contrast, in this case, the contraband was so well

hidden on the 120-foot vessel that it took experienced Coast Guard agents _days_ of searching to discover it.

Thus, in this case, there is no basis for drawing a comparable inference that no innocent crew-member could be aboard. The majority disagrees and reasons, by reference to United States v. Carrasco, 540 F.3d 43 (1st Cir. 2008), that the "practical difficulties" involved in concealing "such a quantity of drugs" makes it unlikely that the crew-members were unaware. But in Carrasco we found sufficient evidence as to two defendants where three men were found with 47 kilograms of cocaine and 170 kilograms of heroin on a twenty-one foot boat. Id. at 45, 49-51. One defendant, Mala, was the captain. Id. at 50 ("'[J]uries may reason that a captain normally knows what his ship contains.'" (quoting United States v. Steuben, 850 F.2d 859, 865 (1st Cir. 1988))). The other defendant, Carrasco, testified that he had loaded the containers (that ultimately were found to contain drugs) on the boat. Id. None of the containers were locked or secured, but were readily accessible. Id. Thus, the analogy to the present case is not sound. To be sure, the 425 kilograms of cocaine and heroin found on the Osiris II is a high-value shipment. But, it is not so much actual weight as to presume that all eight crew-members would be needed to complete the task of loading and unloading the cargo. Further, the evidence suggested that the secret hold was in place for some time and already well concealed on the 120-foot Osiris II.

-30-

<u>Compare</u> <u>id.</u> 50-51 (repeatedly noting the large quantity of drugs on the small boat was an important factor).  Thus, I do not understand why the "practical difficulties" involved in "concealing" the drugs shows involvement by the whole crew.  Considering the numbers involved here, it would be quite practical for a small subgroup of the crew (or for that matter, non-crew) to load the drugs into the secret compartment before the crew reported for duty.

In sum, the high value of the drugs, stashed away in a small secret compartment so difficult to detect that it took the Coast Guard several days to find it, should not be enough to infer entrustment and knowledge to the crew-members of a relatively large freighter.  <u>Cf.</u> <u>Steuben</u>, 850 F.2d at 867 (finding, as to two defendants, insufficient evidence that marijuana being carried in towed vessel was obvious, insufficient evidence that those defendants were willing to help evade capture, and insufficient evidence that the two defendants communicated with the captain, "the only individual who would have had a special reason to know about the nature of the voyage" (internal quotation marks omitted)).  Applying the rule that large volume implies knowledge without requiring evidence of entrustment effectively means that mere presence near a large volume will be enough to support a conviction.  This is not, and should not be, our rule. Thus, in my view, the majority's attempt to portray this case as just another drug boat case mischaracterizes the evidence, finds sufficient

evidence using less evidence than our previous cases, and has the effect of undermining our rule that "mere presence" is not enough to support a conviction. This outcome is a violation of the constitutional requirement of establishing guilt beyond a reasonable doubt.

Third, the evidence regarding the screws simply has no probative weight pertinent to establishing knowledge by the crew that a secret compartment existed or contained illegal drugs. The majority essentially reasons that from the shiny appearance of the screws, a jury could infer that the screws were new; from the fact that the screws were new, a jury could then infer that the drugs were placed recently; and from the fact that the drugs were placed recently, the jury could infer that all crew-members were aware of the drugs. This is at least one, and perhaps two, inferences too many, with the final inferential leap being particularly weak. There is no evidence, or even common-sense reason, that all crew-members would know about the drugs even if the drugs were loaded just before departure. Just as the evidence is entirely consistent with the inference that the captain hired an unaware crew, so is the evidence equally consistent with the inference that those shiny screws were put in place without the knowledge of Brito-Fernández or Casiano-Jiménez. Furthermore, it makes no logical sense to conclude that the presence of "shiny screws" establishes, even by

inference, the presence of illegal contraband. It establishes nothing.

Lastly, as to the question of the legitimacy of the voyage, the majority again relies too heavily on speculation. The evidence in the record is to the effect that the value of the cargo was approximately $25,000. I fail to see how this fact should be enough to establish that the crew-members must have known that the voyage was not for a legitimate commercial purpose. Further, the ship was headed for the Dominican Republic. It is certainly not beyond the realm of reasonable possibility that it would have picked up more valuable cargo at its destination. The government presented no evidence to foreclose this possibility.

Similarly, the majority points out the allegedly inadequate bookkeeping of the captain. But, while it may be amusing that the captain's log was kept in a children's notebook, I fail to see how this fact establishes that the voyage was illegitimate. Such a log may be consistent with how records are kept by captains of "tramp" steamers in the Caribbean. The record certainly does not establish otherwise. Furthermore, the record establishes that the Osiris II's bills of lading, cargo manifests, and crew lists were properly prepared. While a jury and a court reviewing sufficiency of the evidence should not abandon common sense, neither should they rely on their common sense to speculate about what would be the normal practices for those in entirely

foreign situations. In fact, such understanding, outside the ken of an ordinary jury, is something that should normally be proven by expert testimony. In this case, the record does not establish that the state of the Osiris II would be unusual or patently illegitimate to a typical Colombian seaman who plies his trade on "tramp" freighter runs in the Caribbean.[6] Speculation as to what life is like for such individuals should not replace the government's evidentiary burden.

So, a review of the majority's four points shows that all involve overly speculative inferential leaps. From the fact that Colombia is a known source of drugs, the majority speculates that Brito-Fernádez and Casiano-Jiménez must have known they were on a drug-running mission. From the high value of the contraband, the majority speculates that every member of the crew must be aware of the well-hidden drugs. From the shiny screws, the majority infers they were placed recently and then speculates that every member of the crew must be complicit. And from the nature of the legitimate cargo aboard, the majority speculates that the journey would be

---

[6] Petty Officer Andrus did testify that he found the cargo of the Osiris II suspicious, but he did not testify as an expert on the matter, did not explain normal shipping practices for such freighters, and did not rule out the possibility that the freighter might normally perform part of a run while empty.

Further, contrary to the majority's characterization, he eventually conceded that the manner in which the Osiris II's actual cargo was shipped did not pose a risk to the navigation of the vessel.

-34-

obviously illegitimate to an average seaman and imputes knowledge of the drugs to all crew-members. With due respect, I believe the majority opinion draws unfair inferences from speculation, rather than evidence. Cf. United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995) (vacating certain convictions for lack of evidence defendant knew about the drugs, and stating, "we are loath to stack inference upon inference in order to uphold the jury's verdict").

Nonetheless, I agree with the majority that the evidence as to captain Estupinan-Estupinan is strong, especially considering the map in his quarters indicating where the drugs were hidden. The evidence as to the engineer Angulo-Hernández is closer, but barely sufficient. First, unlike the other crew-members, the evidence showed that Angulo-Hernández had made a previous voyage on the vessel. Second the jury could reasonably expect that he, as an engineer, would have a better understanding of the spaces on his boat. This is particularly true in this case where there was evidence that the placement of the secret compartment likely negatively affected the vessel's maneuverability. Thus, while any reasonable jury should be left with reasonable doubt as to whether other crew-members simply signed on to work on a vessel that also carried a secret cargo of drugs, there is no such doubt as to the captain and engineer.

## II.  Lay Opinion

Finding any error to be harmless, the majority does not decide whether Coast Guard petty officer Andrus could permissibly give lay opinion testimony to the effect that, once detained, the crew's "mood changed drastically," the crew "seemed dejected," and "they just knew they were caught."  Though I agree that admission of the evidence was harmless as to Angulo-Hernández and Estupinan-Estupinan, I write separately to state my view that the admission of the last statement was error.

Andrus's statement that defendants "knew they were caught" was not rationally based on the perception of the witness, as is required by Fed. R. Evid. 701.  Unlike Andrus's previous statements, this piece of testimony said much more than that the defendants appeared dejected.  The phrase clearly carries the meaning that the reason the defendants were dejected was because they knew about the existence of the hidden drugs and now knew that the Coast Guard had found the drugs.  Thus, this statement confers Andrus's lay opinion that the defendants had a guilty state of mind -- in effect had consciousness of guilt.  In other words, Andrus was permitted to testify that the reason the defendants were dejected was because they knew they were guilty, rather than for some other reason (such as that they were being arrested by armed agents of a foreign government).

Andrus is entitled to his own speculation about the defendants' mental state, but such speculation should not rise to the level of admissible evidence under Rule 701. This is so because there was no foundation showing that Andrus was qualified to give his lay opinion on defendants' mental state -- as opposed to simply their outward behavior. Thus, Andrus's perception could not rationally support such testimony. See United States v. Kaplan 490 F.3d 110, 118-19 (2d Cir. 2007). Kaplan explains that the purpose of allowing lay witness opinion testimony is to allow a witness "to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts" by "testify[ing] in language with which [the witness] [is] comfortable." Id. at 118 (internal quotation marks omitted). Thus, describing a defendant's appearance as "dejected" fits comfortably within the purpose of Rule 701. But, stating an opinion as to what someone else knows is not so clear-cut. see id. at 119. Specifically,

> lay opinion testimony regarding a defendant's knowledge will, in most cases, only satisfy the rationally-based requirement if the witness has personal knowledge of one or more objective factual bases from which it is possible to infer with some confidence that a person knows a given fact ... includ[ing] what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were.

<u>Id.</u> (internal quotation marks omitted) (modifications in original). Here, Andrus had only his observations of the defendants over several days. There is nothing in the record showing that Andrus was in any position to gain insight into the defendants' mental state. Thus, such testimony was not rationally related to Andrus's perception, and so, should be inadmissible.

Though I conclude the error was harmless as to the captain and engineer,[7] I write separately on this issue because I think that lay opinion testimony like this, which carries such obvious implications about another's mental state, should receive more scrutiny regarding the witness's basis for making the statement. Thus, I differ with the majority in that I would find admission of this statement to be error and hold that district courts should consider the witnesses's ability to perceive a defendant's mental state before allowing lay opinion testimony as to knowledge.

### III. <u>Jurisdiction</u>

I agree with the majority that our caselaw forecloses the argument that we should require a nexus with the United States --

---

[7] The majority concludes its harmless error analysis by adding that "the weight of the evidence against the convicted defendants" also shows that any error was harmless. For the reasons stated <u>supra</u> Section I, I do not concur that weight of the evidence was so strong as to bolster the conclusion that the error harmless. To the contrary, had the district court not explained Andrus's statement, the evidence would have been highly prejudicial as the jury might have seen it as the only direct evidence of knowledge as to the crew-members.

beyond the fact of Bolivia's consent -- to establish jurisdiction under the MDLEA.  See United States v. Bravo, 489 F.3d 1, 7 (1st Cir. 2007).  Nonetheless, I write separately to note my increasing hesitation with this approach, as demonstrated by the facts of this case.  Here, armed agents of the United States government seized the Osiris II and its crews for days while they literally poured over every inch of the vessel.  At the time the Coast Guard encountered the vessel, the Osiris II was a Bolivian vessel on the high seas on its way from Colombia to the Dominican Republic.  Other than being on a suspect vessel list, it gave no appearance of being involved in illegal activity.  Aside from the principles of international law implicated, I have increasing sympathy for the view that due process requires some nexus with the United States before our government can be permitted to board such a vessel and arrest foreign citizens on the high seas for alleged violations of U.S. laws.  See United States v. Zakharov, 468 F.3d 1171, 1177-78 (9th Cir. 2006) ("Due process requires a district court to find sufficient nexus even when the flag nation has consented to the application of United States law.").  One could argue that any such nexus requirement is automatically satisfied by the inherent threat posed by drug trafficking on the high seas.  See United States v. Martínez-Hidalgo, 993 F.2d 1052, 1056 (3d Cir. 1993) (concluding that not all statutes criminalizing conduct on the high seas are justified, but upholding the MDLEA on the theory that because drug

trafficking is universally condemned, it is not "fundamentally unfair" for Congress to punish traffickers).  But, I think that, from the perspective of the foreign individual on the boat, some greater indication of that individual's involvement with the United States should be required before the heavy power of United States law enforcement can be brought to bear against such an individual. The United States cannot be the world's policeman.[8]  If we continue to extend the natural borders of our national jurisdiction, we can expect others to do the same against us.[9]

## IV.  Conclusion

I would reverse the convictions of crew-members Casiano-Jiménez and Brito-Fernández for insufficient evidence.  I would affirm the sentences and convictions of engineer Angulo-Hernández and captain Estupinan-Estupinan because the evidence against them was sufficient to support their convictions, because the evidentiary error was harmless, because our jurisdictional law is clear that no nexus with the United States is required under the

---

[8]   See also Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. U. L. Rev. 149 (2009) (arguing that the original understanding of the constitutional provision giving Congress the power to define and punish crimes on the high seas was to limit Congress's power to punish offenses committed outside U.S. territory to those offenses similar to piracy in terms of universal condemnation).

[9]   See, e.g., Julian Borger and Dale Fuchs, Spanish judge to hear torture case against six Bush officials, The Observer, March 29, 2009, available online at http://www.guardian.co.uk/world/2009/mar/29/guantanamo-bay-torture-inquiry.

MDLEA, and, as to the other issues, for the reasons articulated by the majority. I, thus, respectfully dissent as to Casiano-Jiménez and Brito-Fernández and concur as to Angulo-Hernández and Estupinan-Estupinan.